**SUNGLORY MARITIME, LTD., et al.**

v.

**PHI, INC., et al.**

**CIVIL ACTION CASE NO. 15–896**

United States District Court,
E.D. Louisiana.

Signed September 9, 2016

Robert Burns Fisher, Jr., Alan Davis, Derek Anthony Walker, Chaffe McCall LLP, Joseph Benedict Marino, III, Preis PLC, New Orleans, LA, for Sunglory Maritime, Ltd., et al.

Henry A. King, Michael L. Vincenzo, King, Krebs & Jurgens, PLLC, New Orleans, LA, for PHI, Inc., et al.

## SECTION: "G" (5)

### JUDGMENT AND REASONS

NANNETTE JOLIVETTE BROWN, UNITED STATES DISTRICT JUDGE

This matter came before the Court for trial without a jury from March 17, 2016, to March 18, 2016.[1] The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333, which confers on the federal district courts original jurisdiction over admiralty and maritime claims, and pursuant to 28 U.S.C. § 1332, which provides for original jurisdiction over diversity actions. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and by stipulation between the parties, pursuant to a Letter of Undertaking dated March 25, 2013. The substantive law applicable to this case is the International Convention on Salvage, 1989[2] ("Salvage Convention") and the general maritime law.[3]

The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record. After reviewing all of the evidence and pursuant to Federal Rule of Civil Procedure Rule 52(a), the Court issues the following findings of fact and conclusions of law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts

---

1. Rec. Doc. 59.

2. Apr. 28, 1989, S. Treaty Doc. No. 102–12, 1953 U.N.T.S. 193.

3. *See infra* Part III.A.

it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

## I. BACKGROUND

This case involves a claim for salvage pursuant to the 1989 Salvage Convention arising out of an incident in which a helicopter operated by Defendant PHI, Inc. ("PHI") made an emergency landing aboard a vessel owned by Sunglory Maritime Ltd. and managed by Aeolian Investments S.A. after experiencing unusual vibrations while en route to an offshore oil platform in the Gulf of Mexico. The vessel then carried the helicopter back to shore, where it was removed by crane.

In April of 2015, Plaintiffs filed a claim for costs, seeking the additional fuel expenses and demurrage incurred carrying the Aircraft to port, as well as their survey costs.[4] PHI does not dispute that Plaintiffs are entitled to their reasonable and actual out-of-pocket costs incurred as a result of the aircraft landing on the Vessel.[5] However, Plaintiffs also seek a reward for maritime "salvage" under the general maritime law and the Salvage Convention.[6] As the owners of the vessel upon which the helicopter made its landing, Plaintiffs contend that they qualify as voluntary salvors of the helicopter, and should be awarded a monetary award based on the value of the aircraft and the lives saved by the vessel's actions.[7] PHI contends, on various grounds, that Plaintiffs are not entitled to a salvage award.

Plaintiffs filed the instant complaint on March 23, 2015.[8] On January 5, 2016, PHI filed a motion for partial summary judgment, arguing that Plaintiffs are not entitled to an award of maritime salvage under either general maritime law or the 1989 Salvage Convention.[9] On the same date, PHI filed a motion in limine seeking to exclude the expert testimony of Professor Martin C. Davies, a law professor at Tulane University specializing in maritime salvage law.[10] The Court denied both motions,[11] and a trial without a jury was held from March 17, 2016, to March 18, 2016.[12]

On July 13, 2016, the Court ordered additional briefing to address several issues that had not been adequately covered in the parties' pretrial memoranda.[13] Plaintiffs submitted a post-trial memorandum on July 22, 2016,[14] to which PHI filed a response on July 29, 2016.[15] On August 4, 2016, with leave of Court, Plaintiffs filed a reply memorandum.[16]

## II. FINDINGS OF FACT

### A. The Parties and Property Involved

1. Plaintiffs Sunglory Maritime Ltd. ("Sunglory") and Aeolian Investments SA ("Aeolian Investments") (collectively, "Plaintiffs") are corporations organized and existing under the laws of the Republic of Greece, with their principal office and place of business in Piraeus, Greece.[17]

---

4. Rec. Doc. 53 at 4.

5. *Id.*

6. Rec. Doc. 54 at 4.

7. *Id.* at 4–5.

8. Rec. Doc. 1.

9. Rec. Doc. 17.

10. Rec. Doc. 16.

11. Rec. Docs. 44, 53.

12. Rec. Doc. 59.

13. Rec. Doc. 63.

14. Rec. Doc. 64.

15. Rec. Doc. 65.

16. Rec. Doc. 68.

17. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 2.

Sunglory is the owner, and Aeolian Investments is the manager, of the M/V AEOLIAN HERITAGE (the "Vessel"), a Panamax bulk carrier engaged in international trade.[18]

2. PHI, Inc. ("PHI") is a Louisiana corporation with its principal place of business in Lafayette, Louisiana.[19] The company operates aircraft engaged in passenger transportation under Part 135 ("Commuter and On–Demand Operations") of the Federal Aviation regulations.[20]

3. The insured value of the PHI helicopter no. N764P at the time of the landing on the Vessel was approximately $2,000,000.00.[21]

4. The helicopter weighed 10,800 pounds.[22]

5. The helicopter had a life raft and pontoons aboard it.[23]

6. The Vessel has a value of $50,000,000.00.[24]

## B. Events Leading to Landing on the Vessel

7. On March 24, 2013, PHI helicopter no. N764P (the "Aircraft") was traveling on an outbound flight over the Gulf of Mexico carrying two crew members and seven passengers.[25]

8. At the time the helicopter departed, it had a full tank of fuel.[26]

9. In addition, the pilots and passengers aboard the Aircraft were wearing life vests, and the helicopter had life rafts onboard.[27]

10. Approximately ten miles from shore, the pilot in command, Dean Cole ("Cole"), detected a vibration coming from the Aircraft.[28]

11. First, co-pilot Joshua Brackett ("Brackett") heard an initial pop or bang and felt a slight yaw,[29] defined as a motion about the vertical axis of the helicopter, or in other words, a left and right movement.[30]

12. Following the bang and yaw, the pilots began to experience an unusual and recurring vibration that could be heard by the pilots and felt through their feet.[31]

13. Unsure of the source of the vibration, and approximately 50 miles away from the destined platform, Cole immediately turned the Aircraft around and headed for shore.[32]

18. This fact is uncontested. See id.

19. This fact is uncontested. See id.

20. This fact is uncontested. See id.

21. This fact is uncontested. See id. at 5.

22. This fact is uncontested. Id. at 8.

23. This fact is uncontested. Id.

24. Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 90:24.

25. This fact is uncontested. See Rec. Doc. 54, Pretrial Order, at 7.

26. Test. of Dean Cole, Trial Tr., Mar. 17, 2016, at 16:20–21.

27. Id. at 34:3–5.

28. This fact is uncontested. See Rec. Doc. 54, Pretrial Order, at 7.

29. Test. of Joshua Brackett, Trial Tr., Mar. 17, 2016, at 52:23–25.

30. Test. of Dean Cole, Trial Tr., Mar. 17, 2016, at 20:15–16.

31. Test. of Joshua Brackett, Trial Tr., Mar. 17, 2016, at 53:14–22.

32. This fact is uncontested. See Rec. Doc. 54, Pretrial Order, at 7.

14. After detecting the vibration, Cole tested the Aircraft's controls and found no obvious problems.[33]

15. Cole then attempted to reach air traffic control but was unable to reach them, apparently because the helicopter was in a dead zone portion of the Gulf of Mexico, where radio coverage was unavailable.[34]

16. After Cole was unable to make contact with anyone, he activated the emergency, or "may day," switch, which informed PHI—but not the Coast Guard—that the helicopter was experiencing a problem.[35]

17. The pilots pulled out an "emergency check list" published by PHI to see if they could identify the problem they were experiencing, but the list did not help the pilots diagnose the cause of the vibrations.[36]

18. Although the Aircraft was fully controllable, the vibrations continued and grew in duration and strength.[37]

19. At that point, the Aircraft was about six minutes from land, and flying above a staging area for the port of Corpus Christi, where cargo ships anchor awaiting berths.[38]

20. Cole then decided that the safest course of action was to land on one of the anchored vessels.[39]

21. This decision was made in order to avoid "something worse [that] might happen,"[40] and because of Cole's fear that it "would be hard to explain to the FAA if [the helicopter] did not make it ... why [he] passed up a heliport or helipad underneath [him]."[41]

22. Although the pilots believed they were making a precautionary landing, they acknowledged that, because they did not know the cause of the vibration, one possible outcome of not landing as soon as possible was that they might have to "ditch" the helicopter into the water.[42]

23. The Aircraft initially approached a different ship, but that ship was unsuitable for landing due to obstructions on the deck.[43]

24. The Aircraft crew then sighted the Plaintiffs' vessel, which was along the helicopter's flight path[44] and had a hatch cover marked with the "H" designation, the customary way to designate the location where helicopters should land on a vessel.[45]

---

33. This fact is uncontested. *See id.*

34. This fact is uncontested. *See id.*

35. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 34:13–17, 35:2–9; Test. of Joshua Brackett, Trial Tr., Mar. 17, 2016, at 58:25–59:1.

36. Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 26:10–27:29.

37. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 7.

38. This fact is uncontested. *See id.*

39. This fact is uncontested. *See id.* at 8.

40. Test. of Joshua Brackett, Trial Tr., Mar. 17, 2016, at 56:8–10.

41. Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 33:14–17.

42. *See* Test. of Joshua Brackett, Trial Tr., Mar. 17, 2016, at 56:2–17.

43. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 36:4–15.

44. *Id.* at 36:16–18.

45. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 5.

25. The helicopter then circled the Vessel twice to make sure that the helipad was clear of obstructions and people.[46]

26. Neither Cole nor his co-pilot, Joshua Brackett ("Brackett"), was able to contact anyone aboard the Vessel, and the Vessel did not grant permission for the Aircraft to land.[47]

27. Because Brackett had a better view for landing, Brackett took over the controls[48] and executed a normal, controlled landing.[49]

28. Brackett landed the helicopter on hatch cover # 6, which has an "H" designated for helicopters.[50]

29. The helicopter landed in the center of the "H" marking, which is not located precisely in the center of the hatch cover. The tail of the helicopter initially hung past the hatch cover so that it was not accessible from below.[51]

30. At the time the helicopter landed, the Vessel was rolling from side to side and sometimes pitching.[52]

31. The Vessel has several mast heads,[53] a large accommodation area,[54] a crane on the back of the ship,[55] piping and equipment on her deck,[56] stairs leading to hatch # 6,[57] and raised hatch covers on her deck and around the deck of the vessel.[58]

32. Nevertheless, Cole and Brackett had no trouble safely navigating the obstructions and landing at a normal speed and angle.[59]

33. Because the helicopter had a nearly full tank of fuel, had it landed in the water, it could have caused some pollution.[60]

34. Likewise, if it had landed improperly or crashed on the deck of the Vessel, the Aircraft could have caused a fire or an explosion.[61]

35. However, neither outcome was very likely to occur. The pilots landed the helicopter aboard the Vessel as a precautionary measure to avoid a real but uncertain risk of danger to the property or passengers, but little evidence has been

46. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 37:16–23.

47. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 5; *see also* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 40:20–22.

48. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 18, 2016, at 10:13–17.

49. *Id.* at 13:14–19.

50. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 5.

51. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 43:13–44:1.

52. Dep. Test. of Spyridon Panagiotopolous, Trial Tr., Mar. 17, 2016, at 71:2–3.

53. Pls.' Ex. 10.14.

54. *Id.*; *see also* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 38:9–11.

55. Pls.' Ex. 10.14; *see also* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 39:17–20.

56. Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 38:22–24.

57. *See* Test. of Joshua Brackett, Trial Tr., Mar. 17, 2016, at 59:19–20; *see also* Pls.' Ex. 10.2.

58. *See* Pls.' Exs. 10.2, 10.21.

59. Test. of Dean Michael Cole, Trial Tr., Mar. 18, 2016, at 8:24–9:10; 9:19–23; 13:14–19.

60. Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 16:20–21.

61. *Id.* at 40:6–8.

presented to suggest that if the helicopter had not landed aboard the Vessel when it did, it would have been unable to return to shore and would have been forced to ditch into the Gulf of Mexico instead.[62]

36. At the time the helicopter landed on the Vessel, the pilots did not know whether her cargo was flammable or explosive, or whether her hatch cover could support the weight of the helicopter with nine people onboard.[63]

## C. Events Following the Helicopter's Landing

37. After the helicopter landed, certain crew members asked the PHI pilots why they had landed on the Vessel and whether they were with the U.S. Coast Guard.[64]

38. At the time that the helicopter landed, the chief mate of the Vessel—Spyridon Panagiotopolous—was in his cabin, from where he heard a "loud mechanical noise" coming from the helicopter.[65]

39. Panagiotopolous saw grey smoke emanating from the helicopter when he looked through his port hole and when he came on the deck.[66]

40. The PHI helicopter was much bigger than any other helicopter that the chief mate had ever seen land on the Vessel.[67]

41. Ordinarily, helicopters that land on hatch # 6 are two-person helicopters used to deliver pilots.[68]

42. When small helicopters deliver pilots to the Vessel, they keep their propellers spinning, rather than place their full weight on the hatch cover.[69]

---

62. The Court discusses this fact—and the effect it has on both the issue of liability for a salvage award as well as the amount that ought to be awarded—in more detail in its conclusions of law. *See infra* Parts III.B.3.a; III.C.4. The degree of danger faced by the helicopter is a central issue in this case, and Plaintiffs bear the burden to prove the facts upon which they rely in this matter by a preponderance of the evidence. Although Plaintiffs' briefing and questions posed at trial repeatedly suggested that Plaintiffs' efforts saved the helicopter and the lives aboard it from "imminent peril that would have been faced had they ditched in the Gulf of Mexico," *see* Rec. Doc. 42 at 17, they present little evidence to suggest that ditching was a likely outcome. Pilot Cole testified at trial that he had never considered ditching the helicopter into the ocean. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 18, 2016, at 10:18–19. Although Cole testified that the failure of a tail rotor driveshaft mid-flight—the part that ultimately needed to be replaced—could force a pilot to need to shut down a helicopter and ditch, no evidence was presented in the form of expert testimony or otherwise that would persuade the Court to find that the helicopter was in fact moments away from needing to

ditch, and that without Plaintiffs' aid, it would not have been able to make it the six minutes back to shore. *See* Test. of Dean Michael Cole, Trial Tr., March 17, 2016, at 47:15–19. Although the Court can reasonably infer that the pilots believed they faced some serious risk in order to land on a vessel with which they had not communicated and from which they did not have permission to land, the Court concludes in its analysis below that the danger was possible but not probable.

63. *See* Test. of Dean Michael Cole, Trial Tr., March 17, 2016, at 40:12–14; 40:18–19.

64. *See* Test. of Joshua Brackett, Trial Tr., Mar. 18, 2016, at 22:8–12.

65. Dep. Test. of Spyridon Panagiotopolous, Trial Tr., Mar. 17, 2016, at 66:20–23.

66. *Id.* at 67:7–10.

67. *Id.* at 68:4–7.

68. *Id.* at 68:8–13.

69. Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 91:16–20.

43. By the time Panagiotopolous got to the deck, but before the pilots or passengers had exited the helicopter, he saw crew members standing by with fire hoses.[70]

44. Pilot Cole informed the captain of the ship that the helicopter had made an emergency landing due to engine problems.[71] That information was recorded by the Vessel's second mate on the deck log.[72]

45. When the passengers disembarked from the helicopter, the Vessel crew perceived them to be in shock and afraid.[73]

46. With assistance from the Vessel's crew, the PHI crew secured the Aircraft on the helipad where it had landed with tie-down lines they had aboard the Aircraft.[74]

47. After landing on the ship, the crew and passengers of the helicopter were accommodated by the master and crew of the Vessel.[75]

48. The helicopter's pilots and passengers were provided coffee, drinks, and food and were made comfortable.[76]

49. The master of the Vessel advised Plaintiffs of the incident by telephone, then confirmed by e-mail that a helicopter landed on the Vessel in an emergency.[77]

50. Phaidon Moustakas, acting as principal on behalf of the owners and managers of the Vessel, authorized the actions that were taken onboard with respect to the PHI helicopter, namely assisting the crew and passengers and taking measures to secure the helicopter.[78]

51. After the incident, PHI sent two helicopters to land on the vessel. The helicopters picked up the passengers from the Vessel and took them to shore, and dropped off two helicopter mechanics on the Vessel.[79]

52. These subsequent helicopter landings were coordinated through the Vessel's captain, who selected hatch cover # 2 as a suitable location for these landings.[80]

53. When the two additional PHI helicopters landed, the Vessel's crew was at the ready with fire hoses and emergency equipment.[81]

54. The crew of the Vessel assisted in shifting the helicopter so it could be inspected by PHI's mechanics.[82]

55. PHI's mechanics were unable to diagnose the mechanical problem

70. Dep. Test. of Spyridon Panagiotopolous, Trial Tr., Mar. 17, 2016, at 67:11–17.

71. *Id.* at 71:17–22.

72. Pls.' Ex. 2.

73. Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 71:23–72:3.

74. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 18, 2016, at 11:14–19. Pilots Cole and Brackett testified that the Vessel's crew was in no way involved in tying down the helicopter; however, the Court credits the testimony of Spyridon Panagiotopolous on this point. *See* Dep. Test. of Spyridon Panagiotopolous, Trial Tr., Mar. 17, 2016, at 87:24–88:2.

75. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 5.

76. This fact is uncontested. *Id.*

77. *See* Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 94:15–24; Pls.' Ex. 29.

78. Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 95:19–96:3.

79. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 5.

80. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 45:24–46:2.

81. Dep. Test. of Spyridon Panagiotopolous, Trial Tr., Mar. 17, 2016, at 72:17–20.

82. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 5.

with the helicopter while it was aboard the Vessel.[83]

56. The pilots elected not to fly the helicopter off the Vessel without knowing what was the problem or having the problem diagnosed and repaired.[84]

57. The two pilots and the two mechanics remained on board the Vessel overnight, and were provided food and shelter by the master of the Vessel, who housed them in the ship owner's cabin, the captain's empty room, and the hospital.[85]

58. PHI arranged for off-loading the helicopter at a lay berth in Corpus Christi, and the Vessel made arrangements to sail to that berth to off-load the helicopter.[86]

59. Plaintiffs voluntarily instructed the Vessel's master and her crew to transport the helicopter, pilots and mechanics to the port for the helicopter's discharge.[87]

60. The Sherwin Terminal, where the Vessel was headed to discharge its cargo, advised that the Vessel would not be allowed to dock while the helicopter was still on board.[88]

61. The Vessel, which had been cleared to come into port before the Aircraft landed, delivered the Aircraft to a dock where it was unloaded by PHI on Monday, March 25, 2013, at berth no. 8 in Corpus Christi without incident.[89]

62. The helicopter was removed by crane through a contractor.[90]

63. PHI delivered the Aircraft to its facility in Lafayette, Louisiana, where it was determined that the high-frequency vibration and yawing was caused by broken bolts in the helicopter's tail rotor hanger bearing.[91]

64. It was necessary to replace the tail rotor drive shaft due to the broken bolts.[92]

65. Plaintiffs required PHI to execute a "Limitation of Liability and Release Agreement" freeing the Vessel's owners from any liability for loss or damage to the helicopter while stowed and being transported on the Vessel.[93]

66. The Vessel suffered no physical damage from the landing.[94]

### D. Facts Concerning Actual Expenses Incurred in Rendering Assistance to PHI

67. The hatch cover of the Vessel was surveyed following the incident to determine whether any damage had resulted from the helicopter landing on it.[95]

---

83. This fact is uncontested. *Id.*

84. This fact is uncontested. *Id.*

85. This fact is uncontested. *Id.*

86. This fact is uncontested. *Id.*

87. This fact is uncontested. *Id.*

88. Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 97:1–10; Pls.' Ex. 31.

89. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 7, 8.

90. Dep. Test. of Spyridon Panagiotopolous, Trial Tr., Mar. 17, 2016, at 82:1–3.

91. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 6, 8.

92. This fact is uncontested. *Id.* at 8.

93. Pls.' Ex. 46.

94. This fact is uncontested. *See* Rec. Doc. 54, Pretrial Order, at 8.

95. This fact is uncontested. *Id.*

68. At the time of the incident, the Vessel was chartered to Aquavita International SA ("Aquavita" or "Charterer") at a rate of $11,550 per day pursuant to a charter agreement ("Time Charter").[96]

69. The Time Charter includes Clause 38, contained in a rider agreement, which states that "Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom." [97]

70. The Time Charter also states that "whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed." [98]

71. The Vessel deviated from its otherwise scheduled path in order to offload the helicopter at berth # 8 in Corpus Christi, Texas.[99]

72. At the time of the incident, the Vessel did not go off-hire.[100]

73. Plaintiffs incurred a $500 agency fee paid to Biehl & Co., L.P. for its coordination of delivery of the Aircraft back to shore.[101]

74. Plaintiffs were concerned that the helicopters that landed aboard hatch # 6 had caused damage to the hatch cover, because it appeared to be heavier than the helicopters that normally landed on the Vessel and for which the hatch cover was designed.[102]

75. Accordingly, Plaintiffs contacted three different entities to board the Vessel for inspections: (1) Sabine Surveyors, to inspect hatches # 2 and # 6 for visible external damage to the hatch covers and to gather basic information about the incident; (2) MacGregor/CargoTech, who manufactured the hatch covers, and could thus determine whether the hatch covers or associated machinery were damaged; and (3) the Classification Society Det Norske Veritas ("DNV"), who are responsible for ensuring that the Vessel is at all times "in class." [103]

76. Plaintiffs incurred fees to Sabine Surveyors, Ltd. in the amount of $1,690.87.[104]

77. Plaintiffs incurred survey expenses to DNV in the amount of $3,983.77.[105]

78. Plaintiffs incurred inspection fees to MacGregor/CargoTech in the amount of €3,694.10 ($5,046.98).[106]

96. Pls. Ex. 6; Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 93:13–22; Def.'s' Ex. 20.

97. Def.'s Ex. 20.

98. *Id.*

99. Rec. Doc. 54 at 6–7; Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 105:18–106:1.

100. This fact, and the evidence weighed by the Court in coming to its conclusion, is discussed in greater detail in the Court's conclusions of law. *See infra* Part III.C.6.

101. Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 104:15–105:9; Pls.' Ex. 15.

102. Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 99:13–18.

103. *Id.* at 101:3–102:17; 148:6–8.

104. Pls.' Ex. 18.

105. Pls.' Ex. 19.

106. Pls.' Ex. 12. Defendant does not challenge Plaintiffs' Euro–to–U.S. Dollar conversion, which values the Euro at about $1.37. As of

## III. CONCLUSIONS OF LAW

On March 4, 2016, the Court issued an order denying PHI's motion for partial summary judgment, wherein it addressed a number of the issues that the parties continued to contest in their pretrial memoranda and throughout trial.[107] Although the Court has previously addressed certain issues of law, the Court's prior Order did not grant summary judgment in favor of either party on any issue.[108] Therefore, the Court herein shall address each legal argument maintained by the parties in their pretrial memoranda, including those that the Court first considered in denying summary judgment.

### A. Applicable Law

In its motion for summary judgment, PHI initially argued that the 1989 Salvage Convention did not appear to apply to salvage claims in the United States, as it is rarely invoked by parties or mentioned by U.S. courts, and that courts nevertheless continue to apply general maritime principles of law in evaluating salvage claims.[109] In its proposed conclusions of law, PHI cites the Salvage Convention for its definitions of various terms, including "salvage," but continues to maintain that even "the few cases that have applied the 1989 Sal-

vage Act have continued to rely upon general maritime law in applying the Convention."[110] As such, PHI generally does not cite the Salvage Convention in forming its arguments relating to the elements of a salvage award, and argues that under the principles of general maritime law, Plaintiffs are not entitled to a salvage award.[111]

Plaintiffs, however, urge the Court to conclude that the Convention applies to the instant dispute.[112] According to Plaintiffs, the Salvage Convention effectively displaced any conflicting provisions of general maritime law because the Supremacy Clause of the United States Constitution requires binding international treaties to supersede conflicting common law.[113] Furthermore, at trial, Plaintiffs' expert Martin Davies ("Davies"), a law professor at Tulane University who specializes in the law of marine salvage, testified that there are numerous substantive differences between the Salvage Convention and the general maritime law, both small and large, and that the Salvage Convention should be applied to claims such as the one in this matter, rather than the general maritime law, which has now been displaced.[114]

The Salvage Convention, which was adopted on April 28, 1989 and ratified by

the date of this Order, €1 is valued at approximately $1.13. However, a value of $1.37 is not out of keeping with the value of the Euro in 2013, the year in which this incident took place and during which the survey was ordered and invoiced. *See* Bloomberg Markets, *EURUSD Spot Exchange Rate,* http://www.bloomberg.com/quote/EURUSD:CUR. Accordingly, the Court accepts Plaintiffs' estimate of the dollar value of the cost of the MacGregor/CargoTech survey.

107. Rec. Doc. 44.

108. *Id.*

109. Rec. Doc. 17–1 at 17. PHI repeated this argument in its pretrial memorandum, filed prior to the Court's issuance of its order deny-

ing summary judgment. *See* Rec. Doc. 40 at 13–14.

110. Rec. Doc. 57 at 13 (citing *DOROTHY J v. City of New York,* 749 F.Supp.2d 50 (E.D.N.Y. 2010); *Tow Tell Marine Serv. v. M/V 28' SPENCER,* 2013 WL 6212192 (S.D. Fla. 2013)).

111. *See id.* at 17–23.

112. Rec. Doc. 56 at 15–16.

113. *Id.* at 15.

114. *See* Test. of Martin Davies, Trial Tr., Mar. 17, 2016, at 152:14–153:4; 161:2–11; 162:9–164:14.

the U.S. Senate on October 31, 1991, entered into force for all original signatories on July 14, 1996.[115] Pursuant to the Supremacy Clause of the U.S. Constitution, "all Treaties made, of which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." [116] PHI does not appear to dispute that the Salvage Convention was a self-executing treaty; as such, self-executing treaties become the law of the land even in the absence of implementing legislation.[117] Furthermore, the Salvage Convention provides in Article 2 that it "shall apply whenever judicial or arbitral proceedings relating to matters dealt within this Convention are brought in a State Party." [118] As the United States is a State Party, and the instant matter is a judicial proceeding relating to matters dealt with in the Salvage Convention, the Court can see no reason—

and PHI does not offer any—why the Salvage Convention should not govern as the applicable law in most salvage disputes in U.S. courts.[119]

Nevertheless, PHI is correct that the Salvage Convention is mentioned only occasionally in briefs and rarely in published opinions.[120] One possible explanation for courts' failure to mention the Salvage Convention is that, in some cases, the results under either the Salvage Convention or general maritime principles would be the same.[121] The Fifth Circuit has declined to determine whether the general maritime law survives the adoption of the Salvage Convention, but in *Solana v. GSF Development Driller I*, the court assumed without deciding that general maritime principles continue to apply because, in the case at bar, the result would have been the same under either the treaty or general mari-

---

115. Martin Davies, *Whatever Happened to the Salvage Convention 1989?*, 39 J. Mar. L. & Com. 463, 464 (2008) [hereinafter, Davies, *Salvage Convention* ]; Int'l Mar. Org., *Status of Multilateral Conventions and Instruments in Respect of Which the International Maritime Organization or Its Secretary–General Performs Depository or Other Functions* 452 (2016), http://www.imo.org/en/About/Conventions/StatusOfConventions/Documents/Status–2016.pdf; Jonathan Joseph Beren Segarra, *Above Us the Waves: Defending the Expansive Jurisdictional Reach of American Admiralty Courts in Determining the Recovery Rights to Ancient or Historic Wrecks*, 43 J. Mar. L. & Com. 349, 384 (2012) [hereinafter Segarra, *Above Us the Waves* ].

116. U.S. Const. art. VI, § 2.

117. *See, e.g., Medellin v. Texas*, 552 U.S. 491, 505–08, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (explaining that a treaty is self-executing when it "operates of itself without the aid of any legislative provision," meaning that it acts as a directive to domestic courts and does not require enforcement by the executive branch) (quoting *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829)).

118. Salvage Convention art. 2.

119. One exception would be in salvage operations that take place pursuant to a pre-existing agreement, known as "contract salvage." *See* Davies, *Salvage Convention, supra* note 115, at 465. In such cases, the Salvage Convention states that any agreement between parties to a salvage contract prevails to the extent that the agreement is inconsistent with the terms of the Salvage Convention. *Id.*

120. *See* Davies, *Salvage Convention, supra* note 115, at 464; *see also* Segarra, *Above Us the Waves, supra* note 115, at 384 ("[The Convention] is entitled to be treated as 'the supreme law of the land' in the United States, although it has been strangely ignored by the majority of American admiralty courts.").

121. *See* Davies, *Salvage Convention, supra* note 115, at 464 ("In some cases, [the] failure to acknowledge the applicability of the [Convention] has no practical impact, as the Convention would have the same effect as the pre-existing general maritime law of salvage."); *DOROTHY J v. City of New York*, 749 F.Supp.2d 50, 70 (E.D.N.Y. 2010) (stating that the general maritime law's consideration of six factors to determine the value of a salvage award was "essentially adopted, although not in identical language, by the 1989 Salvage Convention").

time law.[122] A review of the few cases that have invoked the Salvage Convention reveals at least one other example in which a court side-stepped the question of the Salvage Convention's applicability by determining that the outcome would remain unchanged regardless of the source of law,[123] as well as several examples where courts have adopted the language of the Salvage Convention and accepted its applicability.[124]

■ Although the Salvage Convention indeed appears to be often ignored, PHI presents the Court with no argument or reason why the treaty should not be regarded as the supreme law of the land. However, as the relationship between the Salvage Convention and the general maritime law appears to remain undecided, as indicated by the Fifth Circuit in *Solana*,[125] in an abundance of caution, the Court will also consider principles of general maritime law in assessing the issues in this matter. However, to the extent that there may be a conflict between the treaty and general maritime principles, per the Supremacy Clause, the Salvage Convention must determine the outcome.

## B. Salvage Liability

■ "The law of marine salvage is of ancient vintage. In contrast to the common law, which does not grant a volunteer who preserves or saves the property of another any right to a reward, a salvor of imperiled property on navigable waters gains a right of compensation from the owner." [126] "Because of the peculiar dangers of sea travel, public policy has long been held to favor a legally enforced reward in this limited setting, to promote commerce and encourage the preservation of valuable resources for the good of society." [127] An award of salvage is generally appropriate when property is successfully and voluntarily rescued from marine peril.[128]

■ Pursuant to the Salvage Convention, a "[s]alvage operation means any act or activity undertaken to assist a vessel or any other property in danger in navigable waters or in any other waters whatsoev-

---

122. *Solana v. GSF Dev. Driller I*, 587 F.3d 266, 270 (5th Cir. 2009) ("[W]e wish to make clear that we are not determining whether the general maritime law in this area survives the Convention. We simply assume, without deciding, that general-maritime-law principles are applicable, since in this case, the result is the same irrespective of whether the general maritime law or the Convention determines whether a salvage award is owed.").

123. *Port Everglades Launch Serv., Inc. v. M/Y SITUATIONS*, No. 10-60571, 2011 WL 1196017, at *7 n.4 (S.D. Fla. Mar. 29, 2011).

124. *See, e.g., Tow Tell Marine Serv., LLC v. M/V 28' SPENCER*, No. 13-20488, 2013 WL 6212192, at *3 (S.D. Fla. Nov. 27, 2013); *In re Mielke*, No. 10-13519, 2013 WL 5913681, at *6 (E.D. Mich. Nov. 1, 2013); *DOROTHY J v. City of New York*, 749 F.Supp.2d 50, 63, 70 (E.D.N.Y. 2010) (referring to the Salvage Convention as "rephras[ing]" and "adopt[ing], although not in identical language," concepts of the general maritime law of salvage).

125. *Solana*, 587 F.3d at 270; *see also id.* at 272 ("We will assume, but we stress that we are not deciding, that the Convention is enforceable in this nation's courts....").

126. 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 16–1 (5th ed. 2015) (footnote omitted); *see also Mason v. The Blaireau*, 6 U.S. 240, 266, 2 Cranch 240, 2 L.Ed. 266 (1804) (Marshall, J.) (noting that, although it is true that when property on land exposed to grave peril is saved by a volunteer, no remuneration is given, "[l]et precisely the same service, at precisely the same hazard, [b]e rendered at sea, and a very ample reward will be bestowed in the courts of justice").

127. *Margate Shipping. Co. v. M/V JA Orgeron*, 143 F.3d 976, 984 (5th Cir. 1998) (citing *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 337 (2d Cir. 1983)).

128. *The Sabine*, 101 U.S. 384, 25 L.Ed. 982 (1880).

er."[129] The Salvage Convention does not appear to have eliminated the general maritime law's requirement that, to succeed on a salvage claim, a plaintiff must prove three elements: (1) that the property faced a marine peril; (2) voluntary service was rendered when not required as an existing duty or from a special contract; and (3) the salvage attempt succeeded in whole or in part, or contributed to the success of the operation.[130] Here, PHI does not dispute the success of the operation, the third element of a salvage claim.[131] However, before even reaching the three elements of a salvage claim, PHI urges the Court to find that, as a matter of law, the Vessel owners are not the proper parties to claim a salvage award in this matter, and the helicopter in the instant matter is not property subject to a salvage award. The Court will examine each argument in turn before assessing the elements of a salvage claim.

### 1. Party Asserting a Salvage Claim

In an argument that is collateral to the elements of a salvage claim and akin to the requirement that a plaintiff have "standing," PHI claims that Plaintiffs, as the Vessel's owners, have only a limited right, if any, to claim a salvage award in this matter.[132] PHI claims that a shipowner may only share in a salvage award if it appears that the shipowner's property was actually risked or at least at risk of being affected.[133] Here, PHI contends, the owners of the Vessel did not place their Vessel at risk in connection with the landing of the helicopter, the provision of food and accommodations to the passengers and crew of the aircraft, or with the delivery of the helicopter to a berth where it was unloaded.[134] Furthermore, PHI argues, even if it were assumed that the master and crew provided salvage services, neither the crew nor master were joined as plaintiffs.[135] According to PHI, although all those who render service in a salvage operation may share in an award,[136] Plaintiffs may not step in the shoes of the crew for purposes of obtaining a salvage award, and may only recover an award based on their own voluntary contribution and potential risk to their property from the salvage operation, which here was non-existent.[137]

In response, Plaintiffs contend that the Salvage Convention does not instruct a tribunal assessing a salvage claim to consider whether other parties not before the tribunal could potentially have sought an award.[138] According to Plaintiffs, the Salvage Convention's statement that "[s]alvage operations which have had a useful result give rise to a reward" does not in any way imply that a party whose salvage operation had a useful result should be denied an award, or see its award reduced, based on the decision of other potential salvors not to seek an award.[139] Moreover,

---

129. Salvage Convention art. 1(a).

130. *United States v. EX–USS CABOT/DEDALO*, 297 F.3d 378, 381 (5th Cir. 2002) (citing *Nunley v. M/V Dauntless Colocotronis*, 863 F.2d 1190, 1199 (5th Cir. 1989)); *see also* Test. of Martin Davies, Trial Tr., Mar. 17, 2016, at 156:11–13; 161:19–22; 165:11–14.

131. *See* Rec. Doc. 54 at 14–15.

132. Rec. Doc. 40 at 11; Rec. Doc. 57 at 16.

133. Rec. Doc. 57 at 16 (citing Martin J. Norris, *The Law of Seamen* § 9:13 (4th ed. 1985)).

134. *Id.* at 17.

135. Rec. Doc. 40 at 11.

136. *Id.* (citing *St. Paul Marine Transp. Corp. v. Cerro Sales Corp.*, 505 F.2d 1115, 1117 (9th Cir. 1974)).

137. *Id.*

138. Rec. Doc. 56 at 18.

139. *Id.*

Plaintiffs contend, although the Salvage Convention provides the governing law in this case, they would be entitled to an award even under the general maritime law, citing the reasoning in this Court's order denying summary judgment.[140]

■ Although PHI argues that a vessel owner may not recover any reward unless the vessel encounters some kind of physical danger during the course of a salvage operation, the Court agrees with Plaintiff that the Salvage Convention includes no such requirement, and simply states that liability for a salvage award may attach to any "salvage operations which have had a useful result."[141] Accordingly, under the Salvage Convention, the Court can see no reason why Plaintiffs should be barred from bringing suit for a salvage award based solely on the alleged inaction of the Vessel's owners (as opposed to the Vessel's crew).[142]

■ Moreover, considering this matter under the general maritime law would lead to the same result. The leading treatise on the law of admiralty, *Benedict on Admiralty*, clearly states that "[t]here is no limitation as to the type of person who may be entitled to a salvage award."[143] Instead, the treatise explains, the question of whether a person is eligible to receive a salvage reward is strongly tied to the question of whether a service was voluntarily rendered—which is already accounted for as an element of a salvage claim.[144] Nevertheless, PHI argues that as a matter of law, shipowners are precluded from sharing in a salvage award or bringing a claim without evidence that the shipowner's property was actually risked or at least at risk of being affected.[145]

■ Although it is a general rule that a party who does not participate in the salvage service is not entitled to a salvage award, an exception to the rule permits the owner of a salving vessel to share in the award,[146] even if the owner does not take part in, direct, or even know about the salvage operation.[147] A salving owner is granted a salvage reward because of the risk and danger to which his property is exposed.[148] Furthermore, "[s]alvors

---

**140.** Rec. Doc. 52 at 5 (citing Rec. Doc. 44 at 35).

**141.** Salvage Convention art. 12(1). However, Article 15 of the Salvage Convention specifies that "[t]he apportionment of a [salvage] award between the owner, master and other persons in the service of each salvage vessel shall be determined by the law of the flag of that vessel." Therefore, the Court evaluates the portion of the salvage award to which Plaintiffs are entitled below. *See infra* Part III.D.

**142.** The Court addresses PHI's arguments regarding the alleged lack of a voluntary act below. *See infra* Part III.B.3.b. In the alternative, the Court has already found as a matter of fact that Phaidon Moustakas, on behalf of the Vessel's owners, had knowledge of and authorized the crew's actions during the salvage operation. *See supra* Part II.C.

**143.** 3A *Benedict on Admiralty* § 47.

**144.** *Id.*

**145.** Rec. Doc. 40 at 12 (citing Martin J. Norris, *The Law of Seamen* § 9:13 (4th ed. 1985)).

**146.** 3A *Benedict on Admiralty* § 57 (citing *The Blackwall*, 77 U.S. 1, 10 Wall. 1, 19 L.Ed. 870 (1869); *The Camanche*, 75 U.S. 448, 8 Wall. 448, 19 L.Ed. 397 (1869)).

**147.** *DOROTHY J v. City of New York*, 749 F.Supp.2d 50, 77 (E.D.N.Y. 2010).

**148.** *The Blackwall*, 77 U.S. at 13 ("Beyond doubt remuneration for salvage service is awarded to the owners of vessels on account of the danger to which the service exposes their property, and the risk which they run of loss in suffering their vessels to engage in such perilous undertakings, but it is not admitted that the amount of the allowance must be reduced on that ground. Corporations, as the owners of vessels, whether sail-vessels or steamers, may promote a salvage suit, and it makes no difference in that respect whether they were present or absent, provided it appears that the vessel employed was well manned and equipped for the service.").

are not deprived of a remedy because another set of salvors neglect or refuse to join in the suit, nor will such neglect or refusal benefit the libellants by giving them any claim to a larger compensation, as the non-prosecution by one set of salvors enures, not to the libellants prosecuting the claim, but to the owners of the property saved." [149] Thus, it is irrelevant here for the purposes of determining liability that the only plaintiffs bringing suit are the owner and manager of the Vessel; it is well-settled that, under the general maritime law, no other would-be salvors need join a suit in order for the owners of a vessel to make a claim for salvage.

Although at trial the parties disputed the degree of danger allegedly faced by the Vessel in receiving and transporting the helicopter, PHI has cited no authority in which an owner of a vessel that undoubtedly provided salvage services was denied a salvage award because the vessel in question faced an insufficient degree of danger. In support of its claims, PHI cites *The Blackwall* and *The Camanche*, two 1869 Supreme Court decisions that stated, in rebutting arguments to the contrary, that vessel owners could indeed recover salvage awards based on the premise that their vessels bore some risk in providing salvage services. [150] The Supreme Court's pronouncements in those two cases recognized that, as a matter of policy, vessel owners were also entitled to potentially claim a salvage award, rather than limiting the circumstances in which an owner can claim an award to those of especially great risk to a vessel. Other courts have expressed additional policy interests, besides danger to a vessel, that would justify a salvage award to vessel owners, including discouraging masters of vessels from abusing their authority or unreasonably risking the safety of a vessel in order to pursue selfish gains, [151] and to compensate an owner for the expenses of the rescue mission, including the wages of the crew, fuel, and provisions. [152]

A more recent case in the Ninth Circuit, *Bartholomew v. Crowley Marine Services, Inc.*, expressed a similar view to that espoused by PHI, noting that "it has been considered a general, if not universal, rule that the reward is available not only to the salvors but also to the owner of the salving vessel, if there was a risk that the vessel could be affected during the salvage operation." [153] However, the degree of risk borne by a vessel and its crew is usually better assessed in considering the size of a salvage award and how it should be appropriated between salvors, rather than whether one is warranted at all. [154] In *DOROTHY J v. City of New York*, a judge in the Eastern District of New York summarized the law, adhered to across circuits, as follows:

The owner need not take part in, direct, or even know about the salvage operation, to share in the award, although such participation or direction may increase the owner's proportionate share.... An owner's share generally increases when the salving vessel is of large value, when the salving vessel or owner was exposed to substantial risk in

---

149. *Id.* at 12.

150. *See id.* at 13; *The Camanche,* 75 U.S. at 448.

151. *The Nathaniel Hooper,* 17 F.Cas. 1185, 1200 (C.C.D. Mass. 1839).

152. *The Missouri,* 17 F.Cas. 484, 489 (D. Mass. 1854) ("The whole service was co-ordi-

nate. The men could not act without the ship, nor the ship without the men. The right to salvage accrues from the use of the vessel.").

153. 337 F.3d 1083, 1088 (9th Cir. 2003), *as amended* (Sept. 12, 2003).

154. *See DOROTHY J v. City of New York,* 749 F.Supp.2d 50, 77 (E.D.N.Y. 2010).

rendering the services ... when the princip[al] service was performed by the vessel, ... or when the owner directed the service.... In contrast, the share apportioned to the crew generally increases when the risk sustained by the crew was exceptionally high, the salving vessel was not exposed to serious risk or danger ... or where the efficiency of the salvage vessel itself played a small role in the services rendered relative to the individual efforts of the crew ....[155]

Furthermore, courts have granted salvage awards to salving vessel owners without evidence that the salving vessels faced significant risks. For example, in *DORO-THY J v. City of New York*, a judge concluded that a tugboat owner was entitled to a salvage award where the tugboat and its crew provided successful salvage service to a city-owned ferry by arriving alongside the ferry ready to provide potential rescue or other assistance following the ferry's allision with a pier.[156] Similarly, the Ninth Circuit in *Saint Paul Marine Transportation Corp. v. Cerro Sales Corp.* rejected arguments similar to PHI's in a case where crew members went aboard a burning ship to rescue cargo, finding that both the salving vessel's owner and crew members who did not board the burning ship were entitled to a salvage award.[157] There, the court stated, "All who render service in a salvage operation may share in an award. Each individual need not actively participate by manning the small boats, boarding the salved vessel or fighting fires.... Every man's duties on the salving ship contribute to the property salvage and the law extends a portion of the award

to even a 'scullion in the galley peeling potatoes while the actual salvage work is going on.'"[158]

■ Therefore, the Court concludes that the crew need not join the suit in order for the Vessel owners to pursue a claim, and the Vessel need not have faced significant risk of damage in order to allow the Vessel owners to seek a salvage award in this matter. Nevertheless, even if some kind of danger to the Vessel is required, the Court has already found, *supra*, that the Aircraft that landed on hatch # 6 was much larger and heavier than the helicopters that normally land aboard the Vessel, that it was emitting smoke at the time that it landed, and that if it had landed improperly or crashed on the deck of the Vessel, the Aircraft could have caused a fire or an explosion.[159] Accordingly, although the Court has also found that the helicopter was under the control of its pilots when it landed, the Vessel faced some risk of damage from the helicopter's landing.[160] Although it is undisputed that no damage actually occurred, any such risk would be sufficient even under PHI's inaccurate statement of the law to warrant a finding that Plaintiffs have standing to bring suit in this matter. Therefore, the Court declines to conclude that Plaintiffs are not entitled to a salvage award because the Vessel faced an insufficiently large risk in rendering services to PHI's helicopter and its crew.

### 2. Property Subject to a Salvage Award

Next, PHI argues that, as a matter of law, a helicopter is not the kind of proper-

155. *Id.* (citing *The Camanche*, 75 U.S. 448, 461, 470, 472–73; *Conekin v. Lockwood*, 231 F. 541, 544–45 (E.D.S.C. 1916); *Cape Fear Towing & Transp. Co. v. Pearsall*, 90 F. 435, 439 (4th Cir. 1898); *Markham v. Simpson*, 22 F. 743, 744 (S.D.N.Y. 1884)).

156. *DOROTHY J*, 749 F.Supp.2d at 65.

157. 505 F.2d 1115, 1117 (9th Cir. 1974).

158. *Id.* (quoting *The Centurion*, 1 Ware 490 (D. Me. 1839)).

159. *See supra* Part II.C.

160. *Id.*

ty that may be subject to a salvage award.[161] Although the kind of property at issue is not a formal element of a salvage claim, courts considering salvage claims pursuant to the general maritime law have often discussed whether salvage awards are limited only to the salvage of vessels or goods coming from a vessel.[162] Courts have struggled with the question of whether the law of salvage even applies at all to non-vessel property, including cargo, freight, and aircraft.[163] Indeed, "[t]he issue of whether an aircraft recovered in navigable waters is properly the subject of a salvage award remains unsettled." [164] In such cases, before courts even reach the elements of a salvage claim, the question of whether an aircraft is properly the subject of an award is often determined first by examining whether the aircraft was sufficiently "maritime" such as to invoke admiralty jurisdiction.[165] The question also arises in situations where jurisdiction is not at issue.[166] Therefore, the cases suggest that although proving that property is the proper subject of a salvage award is not a traditional element of a salvage claim, where a party alleges that the recovery of certain property, as a matter of law, cannot lead to a salvage award, courts examine that preliminary question separately from evaluating the elements of a salvage claim.

Here, PHI argues that historically, property subject to a claim of salvage has included vessels, property aboard vessels, property thrown overboard or jetsam, property found freely floating on the sea or flotsam, property on the sea attached to buoys, and property washed up to shore-Cin other words, property with a strong "maritime nexus." [167] PHI avers that courts have extended claims of salvage to non-vessel property recovered in navigable waters only in cases that are "extremely rare and the exception to the rule," and only where property was derelict, lost, or otherwise "abandoned" and the salvor took affirmative action to recover the property.[168]

██ Plaintiffs, by contrast, rely on the broad definition of salvageable "property" provided by the Salvage Convention, which states that "[p]roperty means any property not permanently and intentionally attached to the shoreline and includes freight at risk." [169] Under that definition, it is clear that a helicopter, which is not permanently attached to the shoreline, would constitute salvageable property under the Salvage Convention, even if not necessarily under general maritime law, and the inquiry regarding whether a helicopter can be salvaged could end there.

161. Rec. Doc. 40 at 2; Rec. Doc. 57 at 14.

162. 3A *Benedict on Admiralty* § 32.

163. *See id.* at §§ 32–38.

164. *Id.* at § 38. ·

165. *Id.; see also The Crawford Bros. No. 2,* 215 F. 269 (W.D. Wash. 1914); *Matter of Reinhardt v. Newport Flying Serv. Corp.,* 232 N.Y. 115, 133 N.E. 371 (1921); *Lambros Seaplane Base, Inc. v. The Batory,* 215 F.2d 228 (2d Cir. 1954).

166. *See, e.g., Broere v. Two Thousand One Hundred Thirty–Three Dollars,* 72 F.Supp. 115, 116 (E.D.N.Y. 1947) (holding that money found on a body floating in navigable waters could be the subject of salvage, despite arguments to the contrary); *Tidewater Salvage, Inc. v. Weyerhaeuser Co.,* 633 F.2d 1304, 1306 (9th Cir. 1980) (stating as a matter of law, before addressing the question of marine peril, that "[u]nattended logs floating in navigable waters are subject to the law of salvage.").

167. Rec. Doc. 40 at 3.

168. *Id.*

169. Rec. Doc. 56 at 19 (citing Salvage Convention, art. 1(c)).

■ However, in an abundance of caution, the Court herein addresses PHI's arguments concerning whether a helicopter could constitute salvageable property under the general maritime law. PHI urges the Court to conclude that a helicopter is not salvageable property because it lacks a sufficient "maritime nexus." Under traditional general maritime law, "[i]n order for a court to make a salvage award, there should be a nexus between the item salvaged and traditional maritime activities." [170] Traditionally, salvage awards were restricted to objects with explicit connections to ships and vessels; in fact, in 1887, the Supreme Court noted that "no structure that is not a ship or vessel is a subject of salvage." [171] Since then, however, salvage awards have been awarded for the recovery of cargo and fuel,[172] and even to property such as seaplanes [173] and money found on a drowned human body.[174] On the other hand, the Eighth Circuit held in *Provost v. Huber* that a house that sank while being transported by truck over a frozen lake lacked a sufficient maritime relationship to warrant a salvage award.[175]

While the requirement for a "maritime nexus" has a long history, some courts have criticized, for more than a century, the "narrow and restricted doctrine of limiting the subject of salvage services to a ship or goods coming from a ship." [176] In 1871, a judge in the District of Massachusetts determined in *Fifty Thousand Feet of Timber* that two rafts of timber found floating in the Boston Harbor could be the subject of a salvage award, declaring that "[i]f the services are rendered, it is of no consequence whether the goods are a ship or part of a ship, or were ever on board a ship." [177] Similarly, in 1879, a judge in the Eastern District of Virginia stated in *Maltby v. Steam Derrick Boat* that any property of value could be the subject of salvage provided that it was saved under conditions that gave rise to admiralty jurisdiction.[178] The test seemingly applied in other cases, *Maltby* concluded, was not whether the property saved was a vessel or its cargo, "but whether the thing saved is a movable thing, possessing the attributes of property, susceptible of being lost and saved in places within the local jurisdiction of the admiralty." [179]

---

170. Robert Force, Fed. Judicial Ctr., *Admiralty and Maritime Law* 164 (2d ed. 2013).

171. *Cope v. Vallette Dry–Dock Co.*, 119 U.S. 625, 627, 7 S.Ct. 336, 30 L.Ed. 501 (1887). The Supreme Court in the same opinion broadened its own pronouncement, however, and also stated that "[i]f we search through all the books, from the Rules of Oleron to the present time, we shall find that salvage is only spoken of in relation to ships and vessels and their cargoes, or those things which have been committed to or lost in the sea or its branches, or other public navigable waters, and have been found and rescued. It is true that the terms 'ships and vessels' are used, in a very broad sense, to include all navigable structures intended for transportation." *Id.* The Court further noted that items belonging to a ship or vessel, such as furniture and cargo, "clearly" may be the property of salvage, whereas property that has "no connection with a ship or vessel" had met with split

authorities regarding whether they could be the subject of salvage. *Id.*

172. *Allseas Mar., S.A. v. M/V Mimosa*, 812 F.2d 243, 248 (5th Cir. 1987).

173. *Lambros Seaplane Base v. The Batory*, 215 F.2d 228 (2d Cir. 1954).

174. *Broere v. Two Thousand One Hundred Thirty–Three Dollars*, 72 F.Supp. 115 (E.D.N.Y. 1947).

175. *Provost v. Huber*, 594 F.2d 717 (8th Cir. 1979).

176. 3A *Benedict on Admiralty* § 34.

177. 9 F.Cas. 47, 48 (D. Mass. 1871).

178. 16 F.Cas. 564, 566 (E.D. Va. 1879).

179. *Id.*

PHI argues that the "bone-dry" helicopter in this case is the kind of non-vessel property that may not be the subject of a salvage claim.[180] Even where other courts have allowed the recovery of non-vessel property, PHI argues, those awards all involved " 'non-marine' property [that was] derelict, lost, or otherwise 'abandoned' ... in which the salvor took affirmative action to recover the property." [181] Here, however, PHI conflates two separate analyses: first, whether property has a sufficient maritime nexus such that it may be considered salvageable, and second, whether the property was in peril. For example, in *Lambros Seaplane Base, Inc. v. The Batory*, a case cited by PHI, the Second Circuit determined first, as a matter of law, that a seaplane was a marine object that could be subject to salvage.[182] In that analysis, the Second Circuit made no mention of the fact that the seaplane had been abandoned, and focused its inquiry solely on the question of whether the seaplane was a "vessel which is susceptible of salvage under the maritime law." [183] Only *after* concluding that a seaplane was salvageable did the court turn to "whether the other necessary elements of salvage were proved," wherein the Second Circuit discussed the pilot's request for rescue and "that the pilot had no intention of voluntarily returning to the plane" as evidence that it was reasonable for the salvor to believe that the seaplane was in peril.[184] PHI attempts to import factors considered by courts in determining whether a marine peril was present into the test this Court should adopt regarding whether property is a marine object subject to salvage, but it cites no case law to support such a requirement.[185]

PHI also points to the decision of a judge in the District of Maine, in *Historic Aircraft Recovery Corp. v. Wrecked & Abandoned Voight F4U–1 Corsair Aircraft*, which strongly questioned the extension of the law of maritime salvage to claims regarding even abandoned aircraft.[186] First, this Court notes that *Historic Aircraft Recovery*, which is not binding authority in this district, determined that a military plane found in Sebago Lake, Maine, was not the proper subject of a salvage award because the lake in which it was found was not navigable, and therefore not subject to admiralty jurisdiction.[187] The court went on to analyze, however, as PHI does in its briefing, the Supreme Court's decision in *Executive Jet Aviation v. City of Cleveland*.[188] There, a judge in the District of Maine interpreted *Executive Jet* as the Supreme Court "express[ing] its reluctance to extend admiralty jurisdiction to matters involving aviation, at least in the context of torts." [189] In *Executive Jet*, where the plaintiffs sought

180. Rec. Doc. 40 at 4.

181. Rec. Doc. 57 at 14.

182. 215 F.2d 228, 233 (2d Cir. 1954) ("On all the foregoing considerations, we sustain the ruling below that a seaplane when on the sea is a marine object which is subject to the maritime law of salvage.").

183. *Id.* at 231.

184. *Id.* at 233.

185. The other case cited by PHI for this proposition—*International Aircraft Recovery L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1256–57, 1260 & n.13 (11th Cir. 2000)—similarly, upon closer examination, fails to support PHI's argument.

186. Rec. Doc. 57 at 14 (citing 294 F.Supp.2d 132, 139 (D. Me. 2003)).

187. *Historic Aircraft Recovery*, 294 F.Supp.2d at 135.

188. *Id.* at 139 (citing *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972)).

189. *Id.*

to invoke the law of admiralty for federal jurisdiction purposes, the Supreme Court stated that the rules and concepts developed through long experience in admiralty law would be "wholly alien to air commerce, whose vehicles operate in a totally different element, unhindered by geographical boundaries and exempt from the navigational rules of the maritime road." [190] PHI relies on this language to urge this Court to conclude that "an aircraft which safely comes to rest on the designated helicopter landing location on a vessel, and never touches navigable water, is [not] property that may be the subject of a salvage award." [191]

Although *Executive Jet* expressed some reluctance to extend admiralty jurisdiction, at least in the context of torts, to matters involving aviation, *Executive Jet* involved a situation that is distinguishable from the facts in this case. In *Executive Jet*, an airplane, upon striking a flock of seagulls as it was taking off, crashed into the navigable waters of Lake Erie on a flight intended to travel from Cleveland, Ohio to Portland, Maine and then to White Plains, New York—in other words, "a flight that would have been almost entirely over land [and] within the continental United States." [192] As such, the Supreme Court declined to extend admiralty jurisdiction in a situation "which is only fortuitously and incidentally connected to navigable waters and which bears no relationship to traditional maritime activity," [193] stating that the Court could find "no significant relationship between such an event befalling a land-based plane flying from one point in

the continental United States to another, and traditional maritime activity involving navigation and commerce on navigable waters." [194] The Court acknowledged that the situation might be different, however, if a plane flying from New York to London crashed in the mid-Atlantic, as an "aircraft in that situation might be thought to bear a significant relationship to traditional maritime activity because it would be performing a function traditionally performed by waterborne vessels." [195]. Here, it is undisputed the helicopter in question flew on an outbound flight, toward a platform, over the Gulf of Mexico, carrying two crew and seven passengers, and therefore "perform[ed] a function traditionally performed by waterborne vessels," namely ferrying passengers over navigable waters.[196]

Citing *Barger v. Petroleum Helicopters, Inc.*, a 1982 Fifth Circuit case, PHI also argues that the Fifth Circuit has clearly held that helicopters, unlike seaplanes, are not "vessels" for purposes of maritime commerce, even if they fly over the sea.[197] The helicopter need not be a "vessel," however, in order to bear a sufficient maritime nexus to warrant a salvage award. *Barger* held that a pilot of a helicopter that transported passengers to the Outer Continental Shelf was not a "seaman" for purposes of the Jones Act, and thus the exclusive remedy for his wrongful death claim against his employer was the Longshore and Harbor Workers' Compensation Act.[198] *Barger* recognized, however, that *Smith v. Pan Air Corp.*, a Fifth Circuit opinion decided months prior, had held that a pilot of a helicopter that crashed into the Gulf of

**190.** *Executive Jet Aviation*, 409 U.S. at 270, 93 S.Ct. 493.

**191.** Rec. Doc. 40 at 4–5.

**192.** *Executive Jet Aviation*, 409 U.S. at 272, 93 S.Ct. 493.

**193.** *Id.* at 273, 93 S.Ct. 493.

**194.** *Id.* at 272, 93 S.Ct. 493.

**195.** *Id.* at 271, 93 S.Ct. 493.

**196.** Pretrial Order, Rec. Doc. 54 at 7.

**197.** Rec. Doc. 40 at 5 (citing 692 F.2d 337, 339–40 (5th Cir. 1982)).

**198.** *Barger*, 692 F.2d at 338.

Mexico could sustain a wrongful death claim in admiralty against a third party under the Death on the High Seas Act.[199] Similarly, just two years prior, the Fifth Circuit in *Ledoux v. Petroleum Helicopters, Inc.* stated in a short opinion that "[t]he crash of the deceased's helicopter, while it was being used in place of a vessel to ferry personnel and supplies to and from offshore drilling structures, bears the type of significant relationship to traditional maritime activity which is necessary to invoke admiralty jurisdiction."[200] As noted above, the situation cited in *Ledoux* is similar to the case at bar.

The Supreme Court came to the same conclusion in *Offshore Logistics, Inc. v. Tallentire*, a 1986 case in which the Court, citing *Executive Jet*, stated:

> [A]dmiralty jurisdiction is appropriately invoked here under traditional principles because the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity. Although the decedents were killed while riding in a helicopter and not a more traditional maritime conveyance, that helicopter was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers from an "island," albeit an artificial one, to the shore.[201]

Thus, both the U.S. Supreme Court and the Fifth Circuit have recognized that a helicopter that transports passengers to an offshore platform engages in a function traditionally performed by waterborne vessels, and therefore bears a sufficient nexus to traditional maritime activity such that admiralty jurisdiction may be invoked when accidents befall such helicopters. Although this Court recognizes that these decisions have arisen in cases examining the applicability of admiralty jurisdiction, rather than in addressing the law of salvage, this Court sees no reason, and PHI has not offered any, why the question of whether an activity "bear[s] a significant relationship to a traditional maritime activity"[202] should have a different outcome than the question of whether property "bears a strong maritime nexus."

Finally, PHI makes a policy argument that allowing a salvage claim in this case "would potentially open the door for vessel or rig owners to assert a claim for salvage every time a helicopter made a landing because of low fuel, storm activity or an operational concern," an outcome that would create an undesirable disincentive for a pilot to act prudently for fear of a salvage claim being asserted against the helicopter.[203] The Court is not persuaded by PHI's argument. PHI ignores the fact that, even if its landing on the Vessel was precautionary in nature, PHI did not dispute at trial that its mechanics were unable to find any obvious reason for the helicopter's vibration when they examined it on the Vessel, and therefore they decided to return the helicopter to shore aboard the Vessel.[204] By contrast, when a helicopter lands on a vessel to refuel, or even due to storm activity, it is later able to leave the vessel of its own volition, without needing to be ferried to land. Although PHI argues that the helicopter here cannot be considered salvageable property because it was not cargo, where a helicopter either cannot or will not leave a vessel, its situation bears a strong resemblance to that of traditional cargo. Here, it is undisputed

**199.** *Id.* at 338–39 (citing *Smith v. Pan Air Corp.*, 684 F.2d 1102 (5th Cir. 1982)).

**200.** 609 F.2d 824, 824 (5th Cir. 1980).

**201.** 477 U.S. 207, 218–19, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (citation omitted).

**202.** *Id.*

**203.** Rec. Doc. 40 at 6.

**204.** Rec. Doc. 54 at 6.

that the helicopter's crew chose not to fly the helicopter off the Vessel.[205] Therefore, the Court is not persuaded by PHI's argument that allowing a salvage claim in this instance would open the door to a slew of salvage suits whenever helicopters land aboard a vessel because of low fuel, storm activity or an operational concern.

██ Accordingly, the Court concludes as a matter of law that pursuant to either the Salvage Convention or general maritime law, a helicopter that transports passengers to offshore platforms may be subject to a salvage award if recovered or saved in navigable waters.

### 3. Traditional Elements of a Salvage Award

██ As outlined earlier, to succeed on a salvage claim pursuant to the general maritime law, a plaintiff must prove three elements: (1) that the property faced a marine peril; (2) voluntary service was rendered when not required as an existing duty or from a special contract; and (3) the salvage attempt succeeded in whole or in part, or contributed to the success of the

operation.[206] Whether a marine peril exists is a question of fact.[207] The peril necessary to constitute a salvage service need not be one of imminent and absolute danger; the danger must simply be present or "reasonably to be apprehended."[208] "The burden of proof that the vessel or property is in peril is upon the one claiming a salvage award."[209] Voluntariness is also ordinarily an issue of fact.[210] Here, PHI does not dispute the success of the operation, the third element of a salvage claim.

#### a. Marine Peril

██ Plaintiff bears the burden at trial of showing that the property faced a marine peril[211] or, as the Salvage Convention puts it, that the property was "in danger."[212] "The peril necessary to constitute a salvage service need not be one of imminent and absolute danger. The property must be in danger, either presently or reasonably to be apprehended."[213] Courts may consider the degree of peril when determining the amount of the salvage award, but not in assessing whether a salvage award is warranted.[214] " 'Reason-

---

205. *Id.*

206. *United States v. EX–USS CABOT/DEDA-LO*, 297 F.3d 378, 381 (5th Cir. 2002) (citing *Nunley v. M/V Dauntless Colocotronis*, 863 F.2d 1190, 1199 (5th Cir. 1989)).

207. *See Evanow v. M/V Neptune*, 163 F.3d 1108, 1114 (9th Cir. 1998) (citing *Clifford v. M/V Islander*, 751 F.2d 1, 5 (1st Cir. 1984)).

208. *See Fort Myers Shell & Dredging Co. v. Barge NBC 512*, 404 F.2d 137, 139 (5th Cir. 1968).

209. 3A *Benedict on Admiralty* § 63; *see also Am. Home Assurance Co. v. L & L Marine Serv., Inc.*, 875 F.2d 1351, 1355 (8th Cir. 1989) (citing *Clifford*, 751 F.2d at 6).

210. *EX–USS CABOT/DEDALO*, 297 F.3d at 381–82.

211. *Id.* at 381(citing *Nunley v. M/V Dauntless Colocotronis*, 863 F.2d 1190, 1199 (5th Cir. 1989)).

212. Salvage Convention, art. 1(a).

213. 3A *Benedict on Admiralty* § 63 (citing *Harrison v. S/V Wanderer*, 25 F.Supp.2d 754 (S.D. Tex. 1998)) ("To constitute a salvage service, [i]t is not necessary that there be danger immediately impending, but if the vessel is stranded so that it is subject to the potential danger of damage or destruction she may well be a subject of salvage services." (citation omitted)).

214. *Id.*; *see also In re Complaint of The City of New York, as Owner & Operator of M/V ANDREW J. BARBERI*, 534 F.Supp.2d 370, 376–77 (E.D.N.Y. 2008) (citing *McConnochie v. Kerr*, 9 F. 50, 53 (S.D.N.Y. 1881) (requiring only that a ship be confronted by "a situation of actual apprehension, though not of actual danger"), *modified sub nom. McConnochin v.*

able apprehension of injury or destruction if the services are not rendered' is the standard by which peril is adjudged to be present."[215] Without any danger, however, services cannot be called marine salvage.[216]

 PHI argues that the helicopter did not face a marine peril because: (1) the aircraft was at no time actually facing any imminent threat or immediate peril, particularly by the time that the limited services provided by the Vessel—namely carrying the helicopter to a berth for off-loading—were rendered;[217] and (2) an in-flight mechanical issue experienced by the aircraft does not qualify as a "marine peril" for purposes of maritime law.[218] Regarding PHI's first argument, the Court has already made a factual finding that at the time the helicopter chose to land on the Vessel, PHI's crew reasonably believed that the helicopter was in danger of being unable to safely complete its flight to the oil rig.[219] Even if it were to be clear in hindsight that the helicopter did not have a substantially high likelihood of crashing into the Gulf of Mexico, the "marine peril"

test asks not whether the salved property faced an "imminent and absolute danger,"[220] but rather whether the property was "subject to the potential danger of damage or destruction."[221] Nor is the Court persuaded by PHI's argument that the aircraft faced no relevant marine peril because no service was rendered to the helicopter until after it landed aboard the Vessel and was carried to a berth for offloading, as any concern regarding the sufficiency of the services rendered is better addressed in setting the amount of an award.[222] Moreover, without the aid of the Vessel, the helicopter would have been "stranded so that it is subject to the potential danger of damage or destruction,"[223] which alone would be sufficient to constitute a "danger" pursuant to the Salvage Convention or a "marine peril" pursuant to general maritime law. Otherwise, by PHI's logic, towage services would never allow for claims of a salvage award, as being stranded would be insufficient to constitute a marine peril—a proposition that is clearly rebutted by dozens of cases involving towage services.[224]

Kerr, 15 F. 545 (S.D.N.Y. 1883); The Alaska and Her Cargo, 23 F. 597, 607 (S.D.N.Y. 1885) (holding that the degree of peril only "affect[s] the degree of the service, not its nature.")).

215. B.V. Bureau Wijsmuller v. United States, 702 F.2d 333, 338 (2d Cir. 1983) (quoting Phelan v. Minges, 170 F.Supp. 826, 828 (D. Mass. 1959)).

216. M/V ANDREW J. BARBERI, 534 F.Supp.2d at 377 (citing B.V. Bureau Wijsmuller, 702 F.2d at 338).

217. Rec. Doc. 40 at 9.

218. Rec. Doc. 57 at 15 (citing Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 409 U.S. 249, 270, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972)).

219. See supra Part II.B.

220. 3A Benedict on Admiralty § 63.

221. Harrison v. S/V Wanderer, 25 F.Supp.2d 754 (S.D. Tex. 1998).

222. See 3A Benedict on Admiralty § 63 (stating that courts may consider the degree of peril when determining the amount of the salvage award, but not in assessing whether a salvage award is warranted); see also The Alaska and Her Cargo, 23 F. 597, 607 (S.D.N.Y. 1885) (holding that the degree of peril only "affect[s] the degree of the service, not its nature.").

223. Harrison, 25 F.Supp.2d at 758 (quoting Fort Myers Shell & Dredging Co. v. Barge NBC 512, 404 F.2d 137, 139 (5th Cir. 1968)).

224. See, e.g., Miss. Valley Barge Line Co. v. Indian Towing Co., 232 F.2d 750 (5th Cir. 1956); The Kanawha, 254 F. 762 (2d Cir. 1918); Star Towing Co. v. Barge ORG–6504, 301 F.Supp. 819, 822 (E.D. La. 1969); The Varzin, 180 F. 892 (S.D.N.Y. 1910); The Saragossa, 21 F.Cas. 425 (S.D.N.Y. 1867).

■ Next, PHI argues that even if the helicopter faced some danger, the source of the danger was not maritime in nature and therefore, as a matter of law, it was not a "marine peril." [225] The Court notes at the outset that the Salvage Convention makes no mention of the term "marine peril" and discusses only the possibility of "danger in navigable waters or in any other waters whatsoever." [226] However, even under the general maritime law, mechanical difficulties and machinery breakdowns have been considered marine perils when vessels are affected. [227] Although it is disputable whether the rules that would apply to a stranded or broken vessel should apply to a helicopter facing mechanical difficulties while flying over navigable waters, whether a marine peril exists is a question of fact. [228] Moreover, "marine peril includes more than the threat of storm, fire, or piracy to a vessel in navigation." [229]

Therefore, having found no authority, binding or otherwise, stating that, as a matter of law, a court shall not consider it to be a "marine peril" when an airplane faces an alleged risk, however small, of being unable to return to shore while flying above navigable waters, the Court declines to conclude as a matter of law that aircraft cannot face "marine perils" solely by virtue of the fact that they are not vessels. Moreover, as the Court already noted above, once PHI's crew decided that they could not or would not fly the helicopter back to land, the helicopter became akin to "cargo" that, without the aid of the Vessel and its crew, would have been stranded at sea. [230]

■ The Court has already made a factual finding that the Aircraft's pilots believed that had the helicopter not landed on the Vessel, there was a reasonable risk that it would not safely complete its flight, which could require it to "ditch" into the sea. [231] To hold that the helicopter had to first enter navigable waters and then be rescued, or else no claim for marine salvage can be made, would lead to absurd and hyper-literal results. The Court agrees with Professor Davies, who succinctly explained at trial that for property to be considered "in danger in navigable waters," as the Salvage Convention requires, [232] it need not actually enter the water. Moreover, the Court also agrees with Professor Davies' statement that "if you didn't read [the Salvage Convention] as a composite whole, it wouldn't even apply to cargo, which it plainly was intended to do, because the cargo—if the cargo is successfully salved, it never gets into navigable water. It was property that was protected from danger in navigable waters." [233] Although this reasoning was applied to the Salvage Convention, the reasoning applies just as strongly to the general maritime law. A successful salvage

**225.** Rec. Doc. 40 at 9 (arguing that "[t]he very definition of 'marine peril' has no meaning in the context of an aircraft in flight").

**226.** Salvage Convention, art. 1(a).

**227.** *See* 3A *Benedict on Admiralty* § 64 (citing *The Mercer*, 297 F. 981 (2d Cir. 1924); *Steamer Avalon Co. v. Hubbard S.S. Co.*, 255 F. 854 (9th Cir. 1919); *The Roanoke*, 214 F. 63 (9th Cir. 1914)).

**228.** *See Evanow v. M/V Neptune*, 163 F.3d 1108, 1114 (9th Cir. 1998) (citing *Clifford v. M/V Islander*, 751 F.2d 1, 5 (1st Cir. 1984)).

**229.** *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 569 F.2d 330, 337 (5th Cir. 1978).

**230.** *See supra* Part III.B.2.

**231.** *See supra* Part II.B.

**232.** Salvage Convention, art. 1(a).

**233.** Test. of Martin Davies, Trial Tr., Mar. 17, 2016, at 166:1–5.

operation prevents salvageable property from succumbing to the elements; accordingly, the Court concludes that although the aircraft in question experienced a mechanical failure, because, without the intervention of the Vessel, the aircraft was at risk of "ditching" into the sea, or of remaining at sea aboard the Vessel with no ability to return to land of its own volition, the helicopter faced a "marine peril" pursuant to the general maritime law, as well as a "danger in navigable waters" pursuant to the Salvage Convention.

### b. Voluntary Service

As PHI does not contest the third element of a salvage claim—success in whole or in part—the final consideration regarding salvage liability is whether the Vessel performed the services in this matter voluntarily, while under no legal obligation or compulsion to do so.[234] PHI argues that Plaintiffs cannot satisfy the "voluntarily rendered" requirement for a salvage service because they did not "act" in any way to salvage the helicopter.[235] PHI avers that a court in the Southern District of Florida has required a salvor to take "voluntary, affirmative action to aid, rescue or preserve the vessel, her crew, or cargo from a maritime peril."[236] Here, PHI argues, the Vessel took no affirmative action to assist PHI's helicopter in landing on the Vessel's designated helicopter landing spot.[237] According to PHI, the Vessel's crew did not clear objects from the landing spot, change course, or come to a standstill to allow the

helicopter to land, nor did it secure the aircraft after it landed.[238]

Plaintiffs respond that, under the Salvage Convention, which defines "salvage operation" to mean "any act or activity undertaken to assist a vessel or any other property in danger in navigable waters or in any other waters whatsoever," Plaintiffs clearly performed an "act" insofar as they received the aircraft onboard, assisted in pushing it to a location where it could be inspected for damage, provided shelter and sustenance to the helicopter's crew, authorized additional landings to accommodate PHI, and safely transported the helicopter and PHI's personnel to shore.[239] Moreover, Plaintiffs argue, under the general maritime law, Plaintiffs' actions constitute a voluntary act as well because general maritime law recognizes only two forms of marine salvage: pure salvage and salvage by contract.[240] According to Plaintiffs, where a party renders salvage services without a contract, such aid constitutes "voluntary service" regardless of whether it is rendered for monetary gain, humanitarian purposes, or merely by error.[241]

Although PHI makes much of the question of whether Plaintiffs "acted" to rescue the helicopter given the alleged lack of awareness on the part of the Vessel's crew that the helicopter was in fact seeking refuge on the Vessel, general maritime law—which PHI argues should apply here—has long defined voluntariness not as "a service rendered solely from one's

234. *See United States v. EX–USS CABOT/DEDALO*, 297 F.3d 378, 381 (5th Cir. 2002).

235. Rec. Doc. 40 at 9–10.

236. *Id.* at 10 (quoting *Fine v. Rockwood*, 895 F.Supp. 306, 306 (S.D. Fla. 1995)).

237. *Id.*

238. *Id.*

239. Rec. Doc. 56 at 16.

240. *Id.* at 22 (citing *Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d 880, 883 (5th Cir. 1974)).

241. *Id.* at 22–23 (citing *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 338–39 (2d Cir. 1983)).

free will," but rather "performance under circumstances where the performer is not legally obligated to render the act." [242] For this reason, even services that are rendered by accident may be considered "voluntary" for purposes of a salvage claim.[243] Thus, PHI's arguments about the alleged lack of any "act" by the Vessel is unsupported by cases decided under the general maritime law, particularly in light of the fact that even very minor acts, such as giving advice or standing by, have been considered as sufficient to raise a claim for salvage.[244] Moreover, even under the Salvage Convention, which does explicitly require some "act or activity," the Court has already determined that the Vessel and its crew did considerably more than merely fail to interfere with the helicopter's landing, including tying down and securing the helicopter, helping to move it in order to allow for inspection of the tail, using the Vessel's stores to accommodate and make the helicopter crew comfortable, and providing sleeping accommodations for the pilots and mechanics overnight.[245] Although PHI may argue that such aid, if any, was minimal, "[t]he quality and degree of contributory service need only be slight to justify a salvage award; the extent of the service may affect the amount of the award, but not its validity." [246]

Therefore, the Court concludes that pursuant to both the Salvage Convention and the general maritime law, Plaintiffs performed a voluntary act in furtherance of a salvage operation.

### 4. Conclusion

In light of the foregoing, the Court concludes that Plaintiffs have standing to bring a claim for salvage despite the fact that other parties who could have joined the suit chose not to do so, and the helicopter in this instance was property subject to a salvage award. Furthermore, the Court finds that Plaintiffs have satisfied their burden by a preponderance of the evidence and as a matter of law of proving the traditional three elements of a salvage claim, namely that: (1) the property faced a marine peril; (2) voluntary service was rendered when not required as an existing duty or from a special contract; and (3) the salvage attempt succeeded in whole or in part, or contributed to the success of the operation. Accordingly, Plaintiffs are eligible for a salvage award, and the Court next determines the amount to which Plaintiffs are entitled.

### C. Salvage Award

■■■■ "A salvage award is decreed in a court of admiralty not in the way of mere *quantum meruit* for work and labor performed, but as a bounty given on grounds of public policy, to ensure safety of property and life at sea; to promote commerce and trade; to save and restore property to its owners; to induce and encourage others to risk life and limb, if need be, in the interest of saving distressed property; and to eliminate any temptation on the part of the rescuers to despoil the saved property." [247] Accordingly, the public policy of salvage awards is to overcome any unwillingness on the part of salvors to assume additional labor and risks in the interest of saving life and property on navigable waters.[248] Thus, all who render beneficial aid

---

242. 3A *Benedict on Admiralty* § 68.

243. *See B.V. Bureau Wijsmuller,* 702 F.2d at 339 ("Whatever motive impels the true volunteer, be it monetary gain, humanitarian purposes or merely error, it will not detract from the status accorded him by law.") (citing 3A *Benedict on Admiralty* § 68).

244. 3A *Benedict on Admiralty* §§ 15–31.

245. *See infra* Part II.C.

246. *Markakis v. S/S Volendam,* 486 F.Supp. 1103, 1110 (S.D.N.Y. 1980).

247. 3A *Benedict on Admiralty* § 232.

248. *See Lancaster v. Smith,* 330 F.Supp. 65 (S.D. Ala. 1971); *The Missouri,* 17 F.Cas. 484 (D. Mass. 1854).

and who are not legally barred should be entitled to a salvage reward.[249]

■■■■■■ The appropriate salvage award in a particular case is highly circumstantial and generally "should not be based upon fixed percentages of the value of the salved property or upon comparisons to percentages from previous awards." [250] In fixing the amount of a salvage award, the Court, in its sound discretion, must take into consideration all of the facts and circumstances of the salvage operation, weigh and consider them, stress some and discount others, and ultimately arrive at a final figure.[251] The case law stresses that the Court's analysis is an equitable one, meant to consider the unique facts and circumstances of each case and avoid rigid yardsticks, overreliance on precedent, which is rarely if ever on all-fours with the facts of a particular case, or rote application of rule-of-thumb percentages of the value of salved property.[252]

■■■■ Under the general maritime law, courts have long utilized a six-factor test laid out by the Supreme Court in *The Blackwall*, wherein courts consider:

1. The labor expended by the salvors in rendering the salvage service.
2. The promptitude, skill, and energy displayed in rendering the service and saving the property.
3. The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed.
4. The risk incurred by the salvors in securing the property from the impending peril.
5. The value of the property saved.
6. The degree of danger from which the property was rescued.[253]

■■■ In evaluating the *Blackwall* factors, the Fifth Circuit has advised courts to use the first, second, third, fourth, and sixth factor to arrive at a percentage to be applied to the fifth factor.[254] The Fifth Circuit further stated that "[i]n setting the percentage, some care should of course be taken to stay within the bounds of historical practice, ... and to account for all of the relevant circumstances of the specific salvage at issue. The predominant consideration, however, should always be to arrive at an award that reasonably reflects the price upon which the parties would have agreed." [255]

---

**249.** *See The Rio Grande*, 22 F. 914 (S.D.N.Y. 1885); *The Arizonan*, 144 F. 81 (2d Cir. 1906).

**250.** *Jones v. Sea Tow Servs. Freeport N.Y. Inc.*, 30 F.3d 360, 364 (2d Cir. 1994).

**251.** *See The Connemara*, 108 U.S. 352, 359, 2 S.Ct. 754, 27 L.Ed. 751 (1883); 3A *Benedict on Admiralty* § 237.

**252.** *See, e.g., B.V. Bureau Wijsmuller v. United States*, 487 F.Supp. 156, 174 (S.D.N.Y. 1979), *aff'd*, 633 F.2d 202 (2d Cir. 1980) ("Rarely, if ever, are two salvage cases precisely alike and for that reason salvage awards in other cases can seldom be looked to as dependable precedent.") (quoting 3A *Benedict on Admiralty* § 239); *The Rescue v. The George B. Roberts*, 64 F. 139 (E.D. Pa. 1894) ("There is no rule by which the value of the services in such cases can be accurately measured. At best the

award must be the result of an intelligent guess."); *The Waterloo*, 29 F.Cas. 399, 402–03 (S.D.N.Y. 1830) ("[M]arked fluctuations in allowances ... occur[ ] not only between different tribunals, but the books supply us many instances in which enlightened and cautious judges will reward, at one time, with a liberal hand, services which, at another, are compensated sparingly. These diversities arise from the effort of the law to have each cause, in salvage claims, disposed of upon its own particular merits, and, with this view, the whole matter is referred to the discretion of the court which acts in the cause.").

**253.** 77 U.S. 1, 10, 10 Wall. 1, 19 L.Ed. 870 (1869).

**254.** *Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 989 (5th Cir. 1998).

**255.** *Id.*

The Salvage Convention, by contrast, states that "[t]he reward shall be fixed with a view to encouraging salvage operations, taking into account" the following ten factors:

1. The salved value of the vessel or other property;

2. The skill and efforts of the salvors in preventing or minimizing damage to the environment;

3. The measure of success obtained by the salvor;

4. The nature and degree of the danger;

5. The skill and efforts of the salvors in salving the vessel, other property and life;

6. The time used and expenses and losses incurred by the salvors;

7. The risk of liability and other risks run by the salvors or their equipment;

8. The promptness of the services rendered;

9. The availability and use of vessels or other equipment intended for salvage operations;

10. The state of readiness and efficiency of the salvor's equipment and the value thereof.[256]

At trial, Professor Martin Davies testified that the *Blackwall* factors do not apply to cases under the Salvage Convention, and the Salvage Convention's ten factors, as stated in Article 13 of the treaty, should be applied instead.[257] However, at least two district courts that have considered salvage claims pursuant to the Salvage Convention have concluded that the "six *Blackwall* factors were essentially adopted, although not in identical language, by the 1989 Salvage Convention." [258] As the leading treatise on maritime and admiralty law explains, "[b]esides adding the words 'and life' to the end of the [second] *Blackwall* factor . . ., the Convention adds 'minimizing damage to the environment,' the 'measure of success' of the salvor, the 'availability and use of vessels or other equipment' and 'the state of readiness' of the salvor as additional factors to be considered in weighing a proper award amount." [259] Accordingly, regardless of whether the Court frames its analysis in light of the six *Blackwall* factors or the ten factors of the Salvage Convention, the limited case law on this issue suggests that cases decided under the general maritime law are at the very least persuasive authority for this Court's analysis pursuant to the Salvage Convention. Here, the Salvage Convention and the *Blackwall* factors would lead to similar results; however, because the Court has already concluded that the Salvage Convention provides the applicable law in this matter,[260] the Court will frame its analysis pursuant to the Salvage Convention factors.

Finally, the Court notes at the outset of its analysis that "[w]hen salvage claims are asserted, the salvor bears the burden of persuasion regarding salvage value." [261] Despite carrying the bur-

---

256. Salvage Convention, art. 13.

257. Test. of Martin Davies, Trial Tr., Mar. 17, 2016, at 161:7–11.

258. *DOROTHY J v. City of New York*, 749 F.Supp.2d 50, 70 (E.D.N.Y. 2010) (citing Davies, *Salvage Convention*); *see also In re Mielke*, No. 10-13519, 2013 WL 5913681, at *6 (E.D. Mich. Nov. 1, 2013).

259. 3A *Benedict on Admiralty* § 237 (citing *DOROTHY J*, 749 F.Supp.2d at 70); *Baltic Captain Shipping Co. Ltd. v. Blessey Enters., Inc.*, No. 06-2499, 2008 WL 4018550, at *7 (S.D. Tex. Aug. 29, 2008); *In re Mielke*, 2013 WL 5913681, at *6.

260. *See supra* Part III.A.

261. *Allseas Mar., S.A. v. M/V Mimosa*, 812 F.2d 243, 249 (5th Cir. 1987).

den of persuasion, however, Plaintiffs dedicate a total of fewer than three pages in their pretrial memorandum to briefing the Court regarding the salvage award to which they are entitled, and instead state in a conclusory fashion that they are simply entitled to an award of at least $400,000, or 20% of the value of the helicopter, plus an award accounting for the "value" of the "nine lives saved." [262] Likewise, Plaintiffs' conclusions of law regarding the value of any salvage award constitute just four sentences. [263] Therefore, although the Court analyzes the following factors in light of the evidence presented at trial, binding and persuasive authority, and as guided by considerations of equity and the policy goals of the law of salvage, Plaintiffs' complete failure to sufficiently brief the damages portion of its case leaves the Court with little guidance as to Plaintiffs' arguments for why they believe they are entitled to such a large salvage award. [264]

### 1. The Salved Value of the Vessel or Other Property

 It is undisputed that the value of the salved property in this instance was $2,000,000. [265] However, Plaintiffs argue that they are also entitled to an award for the "value" ascribed to the nine lives "saved" through the Vessel's efforts. [266] Plaintiffs cite no law whatsoever to support their request that the Court evaluate the value of nine human lives. Moreover, the Court can find no precedent that would allow for a "life salvage" award that accounts for an additional value added for saving lives.

 Traditionally, "life salvage," as established by the Life Salvage Act, means that a salvor of human life who has, while others have participated in traditional salvage services aimed at saving property, foregone his opportunity to participate in the more profitable endeavor, is entitled to a fair share of the remuneration awarded to salvors of a vessel or her cargo. [267] In

262. *See* Rec. Doc. 42 at 16–18.

263. *See* Rec. Doc. 56 at 3.

264. Rather than brief damages, Plaintiffs chose to urge the Court to strike portions of PHI's briefing that Plaintiffs contended went beyond the scope of Plaintiffs' own limited briefing. *See, e.g.*, Rec. Doc. 52; Rec. Doc. 68. At trial, the Court informed Plaintiffs that it would not strike PHI's pre-trial reply memorandum, and that both parties would have an opportunity to revise their proposed findings of fact and conclusions of law in light of the fact that the Court had issued an order on summary judgment that potentially disposed of certain issues, and following a full day of trial that would constitute the bulk of the proceedings before the Court. *See* Trial Tr., Mar. 17, 2016, at 8:7–10:5. After the Court ordered additional briefing largely aimed at Plaintiffs' failure to address certain issues regarding damages, *see* Rec. Doc. 63, Plaintiffs again objected to an opposition filed by PHI that Plaintiffs contended "re-urges proposed conclusions of law that deal specifically with general maritime law (not the Salvage Convention), many of which are completely irrele-

vant to the issues raised by the Court, and raises arguments which have been fully briefed, have in some cases already been rejected." Rec. Doc. 68 at 2. The Court judges the merits of the parties' arguments—and the appropriateness of any remedy requested—based on the governing law and binding or persuasive precedent, and not on whether a particular argument is repeated to the Court in more than one briefing. Moreover, this Court has never denied Plaintiffs the opportunity to provide additional briefing to address any points they feel have been raised for the first time by Defendant or that they have not previously had an adequate opportunity to address. Accordingly, the Court declines to strike or ignore any portion of Defendant's briefing, and evaluates the arguments presented solely according to their merits.

265. Rec. Doc. 54, Pretrial Order, at 2.

266. Rec. Doc. 42 at 16.

267. *See* Life Salvage Act, 46 U.S.C. §§ 729 (stating that "[s]alvors of human life, who ·have taken part in the services rendered on

other words, life salvage is a derivative claim that exists only when a third party seeks a property salvage award, and is not an independent cause of action or the basis of a separate claim by the person involved in completing the services. As a judge in the District of Oregon succinctly stated in *In re Yamashita–Shinnihon Kisen*:

> The Life Salvage Act does not provide compensation for life salvage, it only allows salvors· of life who have participated in the services rendered on the occasion of the accident giving rise to salvage, a fair share of the property salvage award. Thus, whatever may be the social injustice involved, life salvors are entitled to only a fair share of the compensation awarded to property salvors. Their share must come out of the property award and they have no cause of action against the beneficiaries of their service.[268]

Thus, while the Court may take into account the fact that human lives were involved in the incident at issue in this case—such as in weighing the degree of danger facing the property or human life, below [269]—Plaintiffs present no authority to suggest that the Court can or should calculate the value of any lives "saved" through Plaintiffs' efforts.

■■■ Likewise, although the Salvage Convention directs courts to consider the "skill and efforts of the salvors in salving

the vessel, other property and life," [270] the addition of the words "and life" to that factor suggests only that the Court must consider the *skills and efforts* of salvors regardless of whether they direct such efforts at the saving of life or of property; the Salvage Convention contains no statement, however, instructing the Court to grant an additional monetary award on the basis of the value of any lives saved. Accordingly, as noted above, the only monetary value the Court must consider is the undisputed value of the salved helicopter in this instance, which is $2,000,000.[271]

## 2. The Skill and Efforts of the Salvors in Preventing or Minimizing Damage to the Environment ·

At trial, Plaintiffs presented minimal evidence that the Aircraft, but for the Plaintiffs' efforts, would have caused any damage to the environment. As the Court addresses in greater detail below, Plaintiffs presented no evidence to suggest that, had the helicopter not landed on the Vessel at the ·time that it did, it would more likely than not have crashed into the waters.[272] The Court found as a matter of fact, above, that, at the time the helicopter departed from shore, it had a full tank of fuel, (and therefore, presumably, a nearly full tank by the time it landed aboard the Vessel), and because it had nearly a full tank of fuel, had it landed in the water, it could have caused some pol-

---

the occasion of the accident giving rise to salvage, are entitled to a fair share of the payment awarded to the salvor for salving the vessel or other property or preventing or minimizing damage to the environment"). The Salvage Convention uses similar language: "A salvor of human life, who has taken part in the services rendered on the occasion of the accident giving rise to salvage, is entitled to a fair share of the payment awarded to the salvor for salving the vessel or other property or preventing or minimizing damage to the environment." Salvage Convention, art. 16(2).

**268.** 305 F.Supp. 796, 800 (D. Or. 1969).

**269.** *See, e.g., Joseph v. J.P. Yachts, LLC*, 436 F.Supp.2d 254, 273 (D. Mass. 2006) (noting that the crew was not in peril in determining the degree of danger faced by the salved vessel); *Taylor v. 42 Foot Egg Harbor Hull*, 1994 WL 779759, at \*11 (D.N.J. June 22, 1994) (same).

**270.** Salvage Convention, art. 13(1)(e).

**271.** Rec. Doc. 54, Pretrial Order, at 2.

**272.** *See infra* Part III.C.4.

lution.[273] However, although such pollution was a possibility, Plaintiffs have come forward with only minimal evidence to suggest that they, through their skills and efforts, prevented or minimized such damage to the environment, particularly in light of the fact that they have failed to persuade the Court that a helicopter "ditch" was a likely outcome.[274] Moreover, to the extent that the Vessel's crew helped tie down the helicopter after it landed and thereby prevented it from rolling into the sea and damaging the environment, the skill and efforts required to tie down the helicopter were minimal at best, and were aided by the efforts of pilots Cole and Brackett.

### 3. The Measure of Success Obtained by the Salvor

The assistance rendered by the Vessel contributed to the success of the operation. Namely, through the efforts of the Vessel and her crew, accommodations and nourishment were provided to the crew and passengers of the Aircraft, and the equivalent of towing or cargo services were provided by the Vessel, which ferried the helicopter to shore.[275] However, the Vessel's crew did not aid PHI's pilots or mechanics in attempting to repair the helicopter, and PHI, rather than the Vessel, organized the third-party that removed the helicopter from the Vessel by crane.[276]

### 4. The Nature and Degree of the Danger

The Court has already concluded that the danger faced by PHI's property and the lives aboard the helicopter was sufficient to meet Plaintiffs' minimal burden of proving that a "marine peril" or a "danger in navigable waters" faced the helicopter such that Plaintiffs are entitled to a salvage award for their efforts in this matter.[277] However, the Court has also found, above, that the degree of danger faced by the helicopter was possible, but not probable.[278] Plaintiffs bear the burden to prove the facts upon which they rely in this matter by a preponderance of the evidence. Although Plaintiffs' briefing and questions posed at trial repeatedly suggested that Plaintiffs' efforts saved the helicopter and the lives aboard it from "imminent peril that would have been faced had they ditched in the Gulf of Mexico,"[279] they present little evidence to suggest that ditching was a likely outcome. Pilot Cole testified at trial that he had never considered ditching the helicopter into the ocean.[280] Although Cole testified that the failure of a tail rotor driveshaft mid-flight—the part that ultimately needed to be replaced—could force a helicopter to need to shut down and ditch, no evidence was presented in the form of expert testimony or otherwise that would persuade the Court to find that the helicopter was in fact moments away from needing to ditch, and that without Plaintiffs' aid, it would not have been able to make it the six minutes back to shore.[281]

At best, persistent questioning of the only testifying witnesses with any knowledge of the mechanics of helicopters revealed that, had the helicopter not landed on the Vessel at the moment it did, there

273. *See supra* Part II.B.

274. *Id.*

275. *Id.*

276. *Id.*

277. *See supra* Parts II.B & III.B.3.a.

278. *See supra* Part II.B.

279. *See* Rec. Doc. 42 at 17.

280. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 18, 2016, at 10:18–19.

281. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 47:15–19.

was *some* possibility that the helicopter would have needed to ditch into the Gulf of Mexico before it could reach the shore-line.[282] A typical exchange, during the testimony of co-pilot Joshua Brackett, follows:

Q: And it's true then when you felt the vibrations you wanted to land immediately because you thought something else might go wrong, right?

A. It could happen, yes, sir.

. . .

Q. And, in fact, you made a descent to safer air speed in case something worse might happen; right?

A. Yes.

Q. Did you have any idea what function the helicopter might lose or what might happen due to these vibrations?

A. No.

Q. Something catastrophic might have happened, right?

A. It could have.

Q. And the something catastrophic might be that you end up ditching into the water?

A. There is always the possibility.

A witness's statement that "there is always the possibility" that, should something go "catastrophic[ally]" wrong mid-air, a helicopter would have to ditch into the Gulf of Mexico, does not meet Plaintiffs' burden to persuade the Court by a preponderance of the evidence that the helicopter—or the people aboard it—faced a significant danger of ditching into the ocean. The only evidence the Court has before it regarding the physical problems faced by the helicopter is the yaw reported by the pilots,[283] the vibrations and noises that became more intense as the flight continued,[284] that there was some smoke coming from the tail of the helicopter at the time that it landed on the Vessel,[285] and that the tail rotor drive was ultimately replaced due to broken bolts.[286] However, no evidence has been presented to place these issues into any context. Besides the speculation of counsel, the Court has been presented with no evidence to suggest that the amount of smoke seen, or the level of vibrations felt, or the volume of noises heard, or even the broken bolts in the tail rotor drive shaft would have, had the helicopter not landed when it did, prevented the helicopter from proceeding the additional six miles to shore and landing safely there. Moreover, it is undisputed that the helicopter remained fully controllable even as the vibrations grew in duration and strength.[287] Accordingly, although Plaintiffs primarily focus on the level of danger faced by the helicopter while it was still in the air, the Court concludes that the dan-

282. Test of Joshua Brackett, Trial Tr., March 17, 2016, at 56:2–18.

283. Rec. Doc. 54 at 6.

284. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 30:17–21.

285. *See* Dep. Test. of Spyridon Panagiotopolous, Trial Tr., Mar. 17, 2016, at 77:6–8. Pilot Cole testified that he did not believe that any smoke had been coming from the helicopter prior to landing, and said that he would have been able to see such smoke because the helicopter circled the Vessel before landing. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 41:4–13. Therefore, Cole stated, any smoke seen was likely just the ordinary smoke that is emitted by the engines any time the helicopter is shut down. *Id.* at 41:1–3. However, the Court has already credited the testimony of Spyridon Panagiotopolous in finding that the helicopter was indeed emitting some kind of smoke by the time it landed on the Vessel, though no evidence was presented at trial to suggest that the helicopter emitted smoke while it was still in the air. *See supra* Part II.B. Moreover, Panagiotopolous testified that although he saw smoke coming from the tail of the helicopter, he did not know if it was coming from the engine or some other part of the helicopter. *See* Dep. Test. of Spyridon Panagiotopolous, Trial Tr., Mar. 17, 2016, at 77:6–12.

286. Rec. Doc. 54 at 8.

287. *Id.* at 7.

ger faced at that time was only possible, but not probable, and the landing by the helicopter on the Vessel was primarily a precautionary measure taken to avoid the possibility that an unusually catastrophic event would occur. In other words, although the nature of the potential danger was significant, the degree of likelihood was only moderate.

### 5. The Skill and Efforts of the Salvors in Salving the Vessel, Other Property and Life

As noted above, although Plaintiffs focus primarily on the danger faced by the helicopter at the time that it landed on the Vessel, Plaintiffs presented no evidence to suggest that the Vessel or its crew took any actions to alleviate that danger, such as clearing the deck for a safe landing, or repairing or replacing the tail rotor drive shaft. Accordingly, the skills and efforts the Court must consider are those made after the helicopter landed. The Court has found, *supra*, that the Vessel's crew members stood by with fire hoses both when the Aircraft landed and when subsequent helicopters arrived to drop off mechanics and retrieve the Aircraft's passengers.[288] The Court has also found that the Vessel's crew members aided PHI's pilots in lashing down the helicopter to secure it to the Vessel, as well as moving it so that its tail could be inspected.[289] Finally, the crew offered refreshments and lodging to the helicopter's crew and passengers, as well as the mechanics who later joined to inspect the helicopter.[290] Although these acts required relatively minimal skill, they demonstrate the general willingness of the Vessel's crew to assist in any way they could.

### 6. The Time Used and Expenses and Losses Incurred by the Salvors

Plaintiffs and PHI heavily dispute the actual costs incurred by the salvors in lending assistance to PHI. Plaintiffs assert that "there is no dispute" that they incurred $24,638.73 in actual costs incurred as a result of the Aircraft's landing, Plaintiffs' efforts to return the Aircraft and her crew and passengers to shore, and Plaintiffs' reasonable steps to determine whether the helicopter landings had caused any physical or structural damage to the Vessel's hatch covers.[291] Specifically, Plaintiffs itemize their costs as follows:

| | |
|---|---|
| Loss of Use/Deviation Costs: | $7,459.83 |
| Additional Bunkers/Fuel Consumed: | $5,687.73 |
| Additional Agency Fees: | $500.00 |
| Local Survey's Attendance: | $1,690.87 |
| Classification Surveyor Attendance: | $3,983.77 |
| Hatch Cover Manufacturer's Attendance: | $5,046.98.[292] |

288. Part II.B.

289. *Id.*

290. *Id.*

291. Rec. Doc. 42 at 18.

PHI, by contrast, argues that there is no evidence that the Vessel ever went "off-hire," and therefore no damages should be awarded for "loss of hire" or extra bunkers consumed.[293] Specifically, PHI argues that at the time that the Aircraft landed on the Vessel, the Vessel was subject to a Time Charter, and it remained under charter throughout the salvage operation.[294] Because of the Charter, PHI contends, the Charterer continued to bear all costs for fuel and hire for the Vessel, and thus no expenses for either were incurred during the salvage.[295] Accordingly, PHI argues, although it was unreasonable for Plaintiffs to order three different surveys of the hatch covers following the salvage operation in light of the fact that there was no visible damage to them, the only costs Plaintiffs should be able to recover should be for the costs of the three surveys, as well as the $500 agency fee incurred by Plaintiffs in connection with offloading the helicopter.[296]

Accordingly, of the four categories of damages outlined above, PHI concedes that it is responsible for paying at least $11,221.62 (the $500 agency fees, plus the sum of the three surveys).[297] In addition, in its proposed conclusions of law, PHI suggests that Plaintiffs indeed incurred expenses for their deviation totaling $4,427.50.[298] By contrast, Plaintiffs allege that they incurred $13,147.56 in loss of hire

and additional bunkers consumed. The Court explores this difference, totaling less than $9,000, below.

Although "loss of use" damages more often are discussed by the Fifth Circuit in cases involving a collision or other maritime tort, rather than as an element of actual costs incurred during a salvage operation, the prevailing rule regarding establishing damages for loss of use of a vessel is that the burden of proving the damages actually sustained during a deviation is placed on the Vessel owner, and such damages must be proved with reasonable certainty.[299] Here, Plaintiffs allege that during the time that the Vessel was engaged in the salvage operation, the Vessel went "off-hire," which is defined as the cost to the owner of the Vessel when the Vessel's charterer—in this case Aquavita—is prevented from use of the ship, and therefore is not obligated to pay the charter hire rate.[300] As evidence, Plaintiffs present the charter agreement between Plaintiffs and Aquavita ("Time Charter"), which states that Aquavita will pay a rate of $11,550 per day for use of the Vessel.[301] Clause 38 of the Time Charter, contained in a rider agreement, reads as follows:

> Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position

---

292. *Id.*

293. Rec. Doc. 50 at 9.

294. Rec. Doc. 65 at 8.

295. *Id.*

296. Rec. Doc. 57 at 20.

297. The three surveys cost $1,690.87, $3,983.77, and $5,046.98, the sum of which is $10,721.62.

298. Rec. Doc. 61 at 1.

299. *See Dow Chem. Co. v. M/V Roberta Tabor,* 815 F.2d 1037 (5th Cir. 1987).

300. *See* Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 93:23–94:4.

301. Pls.' Ex. 6.

from the destination and the voyage resumed therefrom.[302]

Here, it is undisputed that the Vessel deviated from its otherwise scheduled path in order to offload the Aircraft at a lay berth in Corpus Christi.[303] Accordingly, Plaintiffs are correct in their interpretation of the Time Charter that such an event could trigger Clause 38 of the Time Charter and cause the Vessel to go "off-hire" for the course of its deviation. However, while Plaintiffs have shown that the Vessel was *eligible* to go off-hire, they have presented no evidence that it actually did go off-hire. Phaidon Moustakas testified that in accordance with his understanding of the Time Charter, the Vessel went off-hire.[304] However, he also testified that he had no record or document reflecting that the Vessel ever actually went off-hire, or reflecting that therefore Plaintiffs were not paid by Aquavita for the entire time that the helicopter was aboard the Vessel.[305] Moustakas agreed during his deposition testimony, as read into the record at trial, that if despite the triggering event, Aquavita continued to pay its full obligation under the Time Charter, then for Plaintiffs to recover the cost of going off-hire in this matter would amount to a double payment, as Plaintiffs would have both received their full payment under the Time Charter and would receive that amount again from PHI.[306]

Plaintiffs bear the burden of proving their actual costs incurred as a result of giving aid to PHI during the salvage operation. Here, Plaintiffs present no evidence that the Vessel actually went off-hire, such as, for example, an invoice reflecting off-hire time for which the Charterer did not pay, a credit that was paid back to the Charterer, or written correspondence or testimony from the Charterer and/or the Vessel owner stating that as a matter of fact, Aquavita would not pay for the time the Vessel spent aiding PHI.[307] Accordingly, while the Court agrees that an event occurred that could have triggered Clause 38 and allowed the Vessel to go off-hire, without any evidence that the Charterer actually invoked the clause and sought a discount or a reimbursement for the time that the Vessel presumably went off-hire, the Court concludes that Plaintiffs have not met their burden by a preponderance of the evidence of showing that they are therefore entitled to the $7,459.38 they seek to reimburse them for the cost of going off-hire.

Likewise, Plaintiffs contend that they spent $6,974.66 for the cost of bunkers, or fuel, consumed in navigating to berth # 8 to discharge the helicopter and then back to the Sherwin Terminal, of which PHI is

---

302. Def.'s Ex. 20.

303. Rec. Doc. 54 at 6.

304. Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 139:18–24.

305. *Id.* at 139:25–140:4; 141:13–18.

306. *See id.* at 141:5–12 ("Q. So, it's, in fact, certainly possible that the very time you are charging PHI ... for offloading its helicopter and that you are also receiving—that you are also receiving at the very same time charter hire from Aquavita International; is that correct? A. If it didn't put us off-hire, it would be

the case. But I don't think that this is off-hire. I would have to check it again.").

307. Although Moustakas testified that, pursuant to his understanding of the Time Charter, he believed that the Vessel had gone off-hire, he did not testify that he actually knew as a matter of fact that the Vessel had done so, and stated that he could not remember whether it had. *See id.* at 142:13–19. Although Plaintiffs produced evidence of a debit note that they sent to PHI to recover for the costs they alleged they incurred from the loss of hire and additional bunkers consumed, *see* Pls.' Ex. 21, they did not produce evidence of a similar note sent by Aquavita to Sunglory.

entitled to a credit of $1,286.93 for fuel that would have been consumed regardless of the salvage operation.[308] However, as PHI notes, pursuant to the Time Charter, "whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed." [309] Furthermore, Moustakas testified that "[w]hen the vessel is on hire, they are responsible for the bunkers consumed, provided they are within certain limits." [310] Therefore, because the Court has already concluded that Plaintiffs have not met their burden of proving by a preponderance of the evidence that the Vessel ever went off-hire, and because no evidence has been produced suggesting that Aquavita sought reimbursement for bunkers that were consumed during the deviation to berth # 8, Plaintiffs are not entitled to any additional costs incurred for the use of bunkers.

Accordingly, in terms of actual costs incurred in the salvage operation, Plaintiffs have only produced evidence regarding the $500 agency fee,[311] as well as $1,690.87 for the survey conducted by Sabine Surveyors, Ltd.,[312] $3,983.77 for the survey conducted by Det Norske Veritas,[313] and $5,046.98 for the inspection conducted by Macgregor/CargoTech.[314] Thus, the sum total for the four expenses is $11,221.62. However, in its findings of fact and conclusions of law, revised both during and after trial,

PHI concedes that Plaintiffs are entitled to at least some remuneration for the 9.2 hours that PHI alleges the Vessel spent traveling out of its way in order to deliver the helicopter to berth # 8.[315] Accordingly, because PHI concedes that Plaintiffs should recover for at least 9.2 hours for deviating off-course at a rate of $11,550 per day, or $481.25 per hour, Plaintiffs are entitled to an additional $4,427.50 in reimbursement for their actual costs. Thus, the sum total to which Plaintiffs are entitled for the time used and expenses and losses incurred by the salvors is $15,649.12.[316]

### 7. The Risk of Liability and Other Risks Run by the Salvors or Their Equipment

Although it is undisputed that the Vessel ultimately incurred no physical damage, [317] Plaintiffs allege that the Vessel faced a "serious risk of damage to the ship and/or her cargo and injury to her crew had the helicopters hit the railing, hatch cover, bridge, or vessel side, or simply fallen through her hatch covers given their considerable weight." [318] The Court has already touched on the risk run by the salvors' equipment elsewhere in this Order, having concluded that the Aircraft that landed on hatch # 6 was much larger and heavier than the helicopters that normally land aboard the Vessel, and that it was

**308.** Rec. Doc. 56 at 11.

**309.** Def.'s Ex. 20.

**310.** Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 142:7–8.

**311.** *See id.* at 104:15–105:9; Pls.' Ex. 15.

**312.** Pls.' Ex. 18.

**313.** Pls.' Ex. 19.

**314.** Pls.' Ex. 12.

**315.** *See* Rec. Docs. 57 at 20 (suggesting the Court award damages for the time spent "carrying the aircraft to Dock No. 8 at the rate of $481.25 per hour or $2,502.50); 61 at 1 (correcting a previous mathematical error and suggesting that the amount owed is $4,427.50).

**316.** This total is the sum of the three surveys ($1,690.87 + $3,983.77 + $5,046.98), plus the $500 agency fee, plus the $4,427.50 suggested by Defendant (for 9.2 hours x $481.25 hourly rate).

**317.** Rec. Doc. 54 at 8.

**318.** Rec. Doc. 42 at 17.

emitting smoke at the time that it landed.[319] Although the Court has credited Spyridon Panagiotopolous' testimony that the Aircraft was larger and heavier than the helicopters that normally land aboard hatch # 6,[320] Plaintiffs did not actually present any evidence concerning the weight capacity of the hatch cover, and therefore the Court cannot determine with any degree of certainty whether the Aircraft was dangerously oversized or simply larger than Panagiotopolous was used to seeing.[321] Moreover, despite Plaintiffs' focus on the parts of the Vessel that the helicopter allegedly could have accidentally hit, such as a mast, the accommodation area, piping and equipment, or raised hatch covers, the Court has credited the testimony of the pilots who stated that they had no trouble safely navigating the obstructions and landing at a normal speed and angle, and that the helicopter was under the control of its pilots when it landed.[322] Therefore, in light of the evidence presented, the Court finds that at best the Vessel faced a moderate risk of damage from the helicopter's landing.[323] Nevertheless, the Court takes into account that Plaintiffs were never given an opportunity to consent to the Aircraft's unexpected landing aboard the Vessel, and were under no obligation to incur such risks on PHI's behalf.

Finally, it is undisputed that PHI signed a limitation of liability agreement with Plaintiffs on March 24, 2013.[324] Pursuant to the contract, PHI agreed to hold the Vessel harmless for any damage which may occur to the Aircraft while it was temporarily stowed aboard the Vessel.[325] The agreement applied only to property damages to the helicopter, and had no effect on any potential liability in regard to personal injuries, damages to third parties, or other damages.[326] Accordingly, the Court concludes that Plaintiffs had, via the limitation of liability, significantly limited their own liability.

## 8. The Promptness of the Services Rendered

PHI does not appear to dispute that, to the extent that Plaintiffs rendered services, they did so promptly. It is undisputed that the crew of the Vessel accommodated the crew and passengers of the Aircraft, providing coffee, drinks, and food, as well as overnight accommodations for PHI's two pilots and two mechanics.[327] Furthermore, the Vessel's crew arrived on the scene of the Aircraft's landing with fire hoses, helped to tie down the helicopter after it landed, and helped to move it so it could be inspected.[328] Finally, Plaintiffs went out of their way to deliver the helicopter to berth # 8, where it could be offloaded.[329] Accordingly, it appears that Plaintiffs acted promptly to render services to PHI.

319. *See supra* Part II.C.

320. *Id.*

321. *See* Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 120:7–121:18 (testifying that there was no measure of how much the hatch cover could bear in the place where he alleged that the helicopter had landed, and that nevertheless weight capacity alone would be an insufficient measure in light of the fact that the speed of the landing, which was also unknown, would affect the calculation of the force on the hatch cover).

322. *See supra* Part II.B.

323. *Id.*

324. Pls.' Ex. 46.

325. *Id.*

326. *Id.*

327. Rec. Doc. 54 at 5–6.

328. *See supra* Part II.C.

329. *Id.*

**9. The Availability and Use of Vessels or Other Equipment Intended for Salvage Operations; The State of Readiness and Efficiency of the Salvor's Equipment and the Value Thereof**

The ninth and tenth factors that the Court considers in determining a salvage award appear to "reflect a policy of rewarding professional salvage companies for undertaking the substantial expense of maintaining equipment on stand-by, ready to respond to a casualty on short notice." [330] Accordingly, these factors are of limited utility in the circumstances of this case because it is undisputed that Plaintiffs were not professional salvors.

**10. Weighing the Factors**

Plaintiffs argue that the skills and efforts of the Vessel and its crew, the risk borne by the Vessel from the unannounced emergency landing, and the value of the property saved entitles them to an award of at least 20% of the value of the $2,000,000 helicopter saved, "to include also the 'value' ascribed to the nine lives saved.' " [331] By contrast, Defendant characterizes Plaintiffs' efforts as "low order salvage," involving minimal risks and services that would entitle Plaintiffs to no more than $13,647.11—the amount that Plaintiffs allege that their loss of hire and additional bunkers cost them for the time that they transported the helicopter essentially as cargo.[332]

The Salvage Convention provides little guidance regarding how the Court is to weigh the ten factors, stating only that: "The reward shall be fixed with a view to encouraging salvage operations, taking into account the [ten factors] without regard to the order in which they are presented. . . ." [333] However, American courts have long discussed the purpose of salvage awards and the policy goals that courts should consider in arriving at an appropriate figure—goals that this Court finds do not conflict with anything stated in the Salvage Convention, and therefore that ought to be examined.

"Because of the peculiar dangers of sea travel, public policy has long been held to favor a legally enforced reward in this limited setting, to promote commerce and encourage the preservation of valuable resources for the good of society." [334] In considering how to weigh the six *Blackwall* factors, the Fifth Circuit has considered academic scholarship aimed at placing the "old and hoary . . . doctrine" of maritime salvage into the modern language of principles of law and economics.[335] Quoting *Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism*, the Fifth Circuit in *Margate Shipping Co. v M/V JA Orgeron* adopted the principle that "the purpose of [court-granted] salvage awards is to encourage rescues in settings of high transaction costs by simulating the conditions and outcomes of a competitive market." [336] "In an ideal world," the Fifth Circuit explained, "every meeting of salvor and sal-

**330.** 3A *Benedict on Admiralty* § 237.

**331.** Rec. Doc. 42 at 16.

**332.** Rec. Doc. 50 at 4–7 (citing *The High Cliff*, 271 F. 202, 203 (2d Cir. 1921)).

**333.** Salvage Convention, art. 13.

**334.** *Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 984 (5th Cir. 1998).

**335.** *Id.* at 985–87.

**336.** *Id.* at 986 (quoting William M. Landes & Richard A. Posner, *Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism*, 7 J. Leg. Stud. 83, 100 (1978)).

vee would result in a freely negotiated contract for salvage services priced at a competitive level. In the real world, however, most meetings of salvor and salvee cannot be resolved in this fashion." [337]

Accordingly, the Fifth Circuit has stated that the law of salvage aims to "create a post-hoc solution that will induce the parties to save the ship without first agreeing on terms." [338] "In order properly to induce the salvor (and salvee) to act, however, the law must provide for a proper and reasonable salvage award, one that gives neither the salvor too little incentive to do the salvage properly, nor the salvee too little reason to care if his property is saved. By definition, this 'efficient' fee is the one that would have been reached by the parties through voluntary negotiation in an open and competitive market, and its value will depend on a number of factual considerations." [339] As such, the Fifth Circuit held, the *Blackwall* factors—which the Court has already concluded differ only in minor ways from the Salvage Convention—represent an explicit guide for the Court to use in weighing the costs and benefits of providing salvage services. [340]

As Defendant has repeatedly urged this Court to consider, the facts and circumstances of this case are unique, and while the Court has analogized certain issues in this matter to cases involving towage or cargo, the parties cited no case, nor could the Court find any, that involved so many of the unusual situations involved in this matter, such as property that is not tradi-

tionally associated with a vessel and "salvage" operations that were performed without the initial consent of the would-be salvors. Therefore, with little guidance from case law, the Court must remember that its overarching goal in determining a proper salvage award must be to "encourage rescues in settings of high transaction costs". [341] and "account for all of the relevant circumstances of the specific salvage at issue" [342] in determining a "proper and reasonable salvage award," [343] with the predominant consideration being to "arrive at an award that reasonably reflects the price upon which the parties would have agreed." [344]

With these considerations in mind, the Court first considers what need, if any, there was to incentivize the actions taken by Plaintiffs. On the one hand, Plaintiffs generally did not need the law to encourage them to act as they did. It is undisputed that Plaintiffs had no notice of the Aircraft's impending landing, as the Aircraft landed without the pilots making radio contact with the Vessel to notify it that they planned to land. [345] Once the helicopter landed, and in light of the fact that the pilots claim that FAA regulations prohibited them from flying the helicopter off the Vessel until the problem had been diagnosed and repaired, [346] the Vessel once again had little choice but to essentially accommodate the Aircraft, its passengers, and its crew. Moreover, the Vessel was informed by the Sherwin Terminal that they would not be able to dock until the helicopter was removed from the Vessel. [347]

---

337. *Id.* (footnote and citation omitted).

338. *Id.*

339. *Id.*

340. *Id.* at 987.

341. *Id.* at 986.

342. *Id.* at 989.

343. *Id.* at 986.

344. *Id.* at 989.

345. Rec. Doc. 54 at 5.

346. *See* Test. of Dean Michael Cole, Trial Tr., Mar. 17, 2016, at 46:17–24.

347. Pls.' Ex. 31.

Accordingly, for the Vessel to be able to continue on and avoid the "huge commercial implications" of any delay, the Vessel had little choice but to help accommodate PHI in its attempts to remove the helicopter from the Vessel.[348] Likewise, to the extent that the Vessel also allowed additional helicopters to land to try to repair the helicopter, this ultimately served to benefit both the Vessel's and PHI's interests, and little evidence has been presented to suggest that the additional landings caused a major inconvenience or danger to the Vessel, despite Plaintiffs' attempts to raise serious doubts regarding whether hatch # 2 could have been harmed. Finally, although the Vessel provided food and shelter, these acts of kindness, while beneficial, carry little if any risk and presumably require fairly minimal financial incentive to encourage them.

On the other hand, the fact that PHI essentially gave the Vessel little choice but to comply with its requests should not inure to the benefit of PHI, lest helicopters that find themselves in similar potential distress see a benefit to purposefully avoiding seeking permission from vessels before landing, or force themselves upon those who have no desire to act as salvors. The helicopter's decision to land on the Vessel was unilateral and unconsented to,

and the Court declines to incentivize such commandeering of a foreign vessel, particularly when, as here, the company then argues that not only should no salvage award be issued, but few if any actual costs were incurred by virtue of the helicopter's landing.[349]

PHI argues that Plaintiffs should only be able to recover their actual costs incurred—or essentially what they term an award of "quantum meruit." [350] However, the case law has explicitly and repeatedly rejected such calculations.[351] "Compensation as salvage is not viewed by the admiralty courts merely as pay, on the principle of a *quantum meruit*, or as remuneration pro opera et labore, but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." [352] The Fifth Circuit in *Margate* directed courts to attempt to calculate the costs and benefits of a salvage operation and determine the price that two parties engaged in an arms-length negotiation would have agreed to, and therein acknowledged that this calculation is not to be made as one of mere *quantum meruit*, as *quantum meruit* fails to account for the risk that a salvage operation will be unsuccessful, and that therefore the salvor will be unable to recover any award.[353] Al-

---

348. *See id.*

349. *See* Rec. Doc. 40 at 16.

350. Rec. Doc. 57 at 20 (citing *The High Cliff*, 271 F. 202, 203 (2d Cir. 1921)).

351. *See, e.g., Fine v. Rockwood*, 895 F.Supp. 306, 308 (S.D. Fla. 1995) ("The salvage award, which is unique to maritime and admiralty law, is not one of *quantum meruit* as compensation for work performed. Rather, it is a bounty given on grounds of public policy to encourage the rescue of life and property imperiled at sea and to foster maritime commerce."); *Seaman v. Tank Barge OC601*, 325 F.Supp. 1206, 1209 (S.D. Ala. 1971) ("It is unquestioned that salvage awards are not quantum meruit, but are rewards for seamen

who voluntarily act to rescue life and property from the perils of the sea. It is public policy that these awards be liberal in order to encourage mariners to instinctively respond to need.").

352. *The Blackwall*, 77 U.S. 1, 14, 10 Wall. 1, 19 L.Ed. 870 (1869).

353. *See Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 987 n.14 (5th Cir. 1998) ("Because the salvor gets nothing for an unsuccessful rescue, one of his legitimate costs is that risk. To even things out, the salvor will want to receive a premium in the instances where he is successful.") (citation omitted).

though PHI vehemently argues that Plaintiffs on the one hand are not entitled to a salvage award because they took on no "voluntary act" and therefore did not choose to aid the Aircraft, PHI's proposal of a mere *quantum meruit* award on the other hand does not take into account any risk or inconvenience borne by Plaintiffs, and offers no premium based on the fact that indeed Plaintiffs had little meaningful choice regarding whether, when, and how they would offer assistance to PHI. Accordingly, the Court declines to award Plaintiffs only their actual costs incurred, as doing so would directly contradict the vast body of salvage law that has explicitly rejected such calculations.

Neither party has suggested a reasonable salvage award to the Court. On the one hand, Plaintiffs quite clearly seek a windfall, asking for at least $400,000 as an award in a matter in which even by Plaintiffs' calculations, the services rendered cost Plaintiffs no more than $24,648.73. As a judge in the Southern District of New York responded in a case with a similarly unsupported request of between $700,000 and $5,000,000 in damages:

> These sums are grotesquely disproportionate with reality, with the work done, the risk incurred and the actual benefits

conferred by the plaintiffs upon the ship and cargo owners who are asked to pay them. It is certainly the policy of the maritime law to grant salvage awards that will encourage seamen to incur risk in going to the aid of vessels in distress; but it was never the policy of the law to allow a situation created by calamity to be converted into a windfall of unreasonable extravagance.[354]

On the other hand, PHI unconvincingly argues that Plaintiffs should be awarded no more than the minimum costs that they can prove to the Court by a preponderance of the evidence, and that any such award should be further split in light of the fact that other parties failed to join suit to claim a salvage award.[355]

■ Thus, weighing all of the factors above, as well as the policy considerations of salvage awards, the Court concludes that a salvage award that is more than *de minimis*, but far less than the windfall requested by Plaintiffs, is appropriate. Weighing the factors against one another, and considering the actual costs incurred by Plaintiffs, the Court concludes that a $50,000 salvage award, in addition to the $15,649.12 in actual costs incurred, is appropriate in this matter.[356]

---

354. *Sobonis v. Steam Tanker Nat'l Def.*, 298 F.Supp. 631, 640 (S.D.N.Y. 1969).

355. *See infra* Part III.D.

356. Although the Salvage Convention includes actual costs incurred as part of the overall salvage award, in this instance, bundling the actual costs incurred with the award would lead to an inequitable result, whereby Plaintiffs would recover little more than their actual costs incurred because the Court has concluded that Plaintiffs are only entitled to 50% of the total award, in light of the fact that the master of the Vessel and its crew did not join in this suit. *See infra* Part III.D. As *Benedict on Admiralty* advises, "[e]xpenses, disbursements and damages are sometimes included in the award and sometimes stated

separately from the award. The better practice is to include it in the award unless an award to the salving crew is being considered, in which case it should be stated separately from the award. Otherwise, the crew may be sharing in the owner's expenditures when the apportionment between owner and crew is made." 3A *Benedict on Admiralty* § 210.

Here, no award is being made to other salvors, but, below, the Court concludes that Plaintiffs cannot be awarded the share that, under Greek law, the master and crew would otherwise be entitled to. Accordingly, the Court concludes that Plaintiffs should be awarded their actual costs separately from the salvage award to which they are otherwise entitled.

Finally, because the Court has awarded less than $200,000, the Court need not address PHI's arguments that the award should be capped at $200,000 in light of Plaintiffs' initial disclosures in this matter.[357]

## D. Apportionment of the Award

■ PHI alleges that pursuant to the general maritime law, any award to the Vessel's owners should be reduced in light of the fact that the master, crew, and charterer of the Vessel did not join in the suit.[358] According to PHI, the "non-prosecution by one set of salvors ... inures, not to the plaintiffs prosecuting the salvage claim ..., but to the owners of the property saved (PHI)."[359] In response, Plaintiffs initially argued that the Salvage Convention does not instruct this Court to consider whether other parties not present in this action could have potentially sought an award, nor does it "suggest that the decision of one or more salvors not to participate in a claim should detract from the award issued to those salvors who do assert a claim."[360] However, as the Court noted in its Order requiring additional briefing, the Salvage Convention is not completely silent on this issue.[361] In Article 15, the Salvage Convention states that "[t]he apportionment between the owner, master and other persons in the service of

each salving vessel shall be determined by the law of the flag of that vessel." The AEOLIAN HERITAGE flew under the flag of Greece, and therefore the Court ordered additional briefing from the parties regarding the Greek law on the apportionment of salvage awards.

### 1. Apportionment Between the Owners, Master, and Crew

■ Under American general maritime law, PHI is correct that the law is clear that the failure of one set of potential plaintiffs to join in a suit for a salvage award inures, not to the benefit of the plaintiffs who do bring suit, but to the owner of the salved property.[362] This means that if, for example, a district court concludes that a total salvage award should total $100,000, to which the owner of the vessel would be entitled to 50%, the owner of the vessel may receive only $50,000 from the owner of salved property even if the owner is the only salvor who brought a claim of salvage against the property owner.[363]

■ Under the general maritime law, the total percentage of an award to which a vessel owner should be entitled is not fixed at a particular percentage of the total award, but must be determined by the Court in light of the role played by the Vessel, as compared to the master and the crew.[364] Although there is no "fixed rule,"

357. *See* Rec. Doc. 50 at 1–4.

358. Rec. Doc. 65 at 3, 6.

359. Rec. Doc. 57 at 17 (citing *The Blackwall*, 77 U.S. 1, 12, 10 Wall. 1, 19 L.Ed. 870 (1869)).

360. Rec. Doc. 56 at 18.

361. *See.* Rec. Doc. 63 at 1.

362. *The Blackwall*, 77 U.S. at 19; *see also Allseas Mar., S.A. v. M/V Mimosa*, 812 F.2d 243, 247 (5th Cir. 1987).

363. *See, e.g., DOROTHY J v. City of New York*, 749 F.Supp.2d 50, 80 (E.D.N.Y. 2010) (reduc-

ing the salvage award that the defendant needed to pay by $28,796.67 in light of the fact that the salvors who would have been entitled to that amount did not join the suit); *Spencer v. The Charles Avery*, 22 F.Cas. 917, 919 (S.D. Ohio 1857) (reducing the total salvage award by the amount to which those salvors who waived their claims would have been entitled).

364. *See Conekin v. Lockwood*, 231 F. 541, 544 (E.D.S.C. 1916) ("There appears to be no fixed rule [under federal law] with respect to the apportionment of the salvage reward between the owners of the salving vessel and her officers and crew. The distribution in all

the owner of a salving vessel "generally receives a greater portion of the total award than its crew."[365] "Owners are generally allotted larger shares of salvage awards in recognition of the fact that a salving vessel, rather than the efforts of a crew, usually plays the central role in facilitating the success of a salvage operation."[366] Here, in light of the fact that the crew did relatively little to aid the helicopter, and considering that it was the Vessel and its owners that bore most of the inconvenience and potential harm of aiding the helicopter, the Court would be inclined to award 75% of the total salvage award to the Vessel owners, and 25% to the Vessel's master and crew if general maritime law were to apply here.

However, the Court has already determined, *supra*, that although the general maritime law may be helpful in interpreting the Salvage Convention, the Salvage Convention is the supreme law of the land, and "to the extent that there may be a conflict between the treaty and general maritime principles, per the Supremacy Clause, the Salvage Convention must determine the outcome."[367] Here, the Salvage Convention, through its invocation of Greek law, indeed requires a different outcome than the general maritime law. The Court is aware that, until the Court ordered additional briefing, no party appeared to foresee that Greek law might come to play a role in the Court's analysis. Indeed, Plaintiffs argue in their post-trial briefing that issues arising under foreign

law, which PHI never raised, are not determinative.[368] However, PHI did not need to raise Greek law in order for the Court to apply it here; Plaintiffs implicitly did so by repeatedly urging the Court to apply the Salvage Convention, which includes a choice-of-law provision regarding the apportionment of salvage awards.[369] Although Plaintiffs argue that PHI "never rebutted in any material way" Plaintiffs' position that there is no need to apportion an award where the Vessel's master and crew chose not to join this suit, Plaintiffs misrepresent the record, wherein PHI clearly argued in its proposed conclusions of law and in pretrial memoranda that Plaintiffs should not be able to recover the master's or crew's portion of any salvage award, a position Plaintiffs never meaningfully rebutted.[370] Accordingly, the Court considers this matter under Greek law, as required by the Salvage Convention, which Plaintiffs have urged this Court to apply.

When analyzing foreign law, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."[371] Both Plaintiffs and PHI have provided to the Court opinions regarding Greek law on apportionment, as provided by two Greek law firms hired by the parties to provide their opinions on the relevant Greek law.[372] Both appear to agree that Article 251 of the Greek Code of Private Maritime Law ("CPML") states the applicable law regarding the apportionment of salvage

---

cases of this kind is a matter resting in the discretion of the court, and is governed largely by the peculiar circumstances of each individual case."); *see also Jacobson v. Panama R. Co.*, 266 F. 344, 346–47 (2d Cir. 1920).

**365.** *Waterman S.S. Corp. v. Dean*, 171 F.2d 408, 412 (4th Cir. 1948).

**366.** *DOROTHY J*, 749 F.Supp.2d at 77.

**367.** *Supra* Part. III.A.

**368.** Rec. Doc. 64 at 2.

**369.** Salvage Convention, art. 15.

**370.** *See* Rec. Docs. 50 at 10–12; 57 at 17.

**371.** Fed. R. Civ. P. 44.1.

**372.** *See* Vgenopoulos & Partners Law Firm's Legal Opinion on Law Greek, Rec. Doc. 64–1 (Plaintiff's opinion); Ince & Co.'s Legal Opinion, Rec. Doc. 65–1 (PHI's opinion).

awards.[373] Article 251 states, in translation, that "[i]f the salvage assistance has been offered by a vessel, half of the award belongs to the owner of the vessel, one quarter thereof to the master thereof and the other quarter to the crew thereof, whilst any agreement providing otherwise is void." [374]

Plaintiffs acknowledge that Article 251 provides the basis for apportioning an award between co-salvors, but argue that it "does not mean that where one or more of them (the master, crew, or owner) does not make a claim, the remaining salvor(s) cannot make [a] claim for the entire amount." [375] Instead, Plaintiffs argue, Greek law explicitly allows a vessel owner to pursue the entirety of a salvage award as the assignee of the master and crew.[376] Under Greek law, Plaintiffs allege, the only requirements for an assignment are a valid claim, an agreement to assign the claim, which may be oral, implicit, or by conduct, and announcement of the assignment to the defendant.[377] Here, the opinion by Greek counsel provided by Plaintiffs states that seamen are familiar with salvage, and moreover the master and crew were aware of the proceedings in this federal court, as evidenced by the fact that the master testified in this matter.[378] Accordingly, Plaintiffs argue, the fact that the master and crew left the Vessel's owners to pursue the salvage claims in their own name and assisted them in doing so, instead of bringing their own claims, can be deemed an assignment of their respective rights, and as such Plaintiffs are entitled to 100% of the salvage award.[379]

In addition, Plaintiffs argue that although the Piraeaus Court of Appeals, in Judgment No. 455/2008, found that owners were not entitled to recover the salvage award portion of master and crew, that case is inapplicable here because it did not involve an assignment of claims.[380] Furthermore, Plaintiffs contend, the case has no precedential value, because Greece is a civil law country following a codal system of law, and thus case law is not considered a source of law under Greek law.[381]

In response, PHI argues that under Article 251 of the CPML, Plaintiffs are statutorily limited to recovering 50% of the total salvage award due.[382] PHI agrees with Plaintiffs' interpretation of the Piraeus Court of Appeal's decision in No. 455/2008, wherein the court held that "if a co-salvor ... has waived its right to pursue salvage remuneration, the amount thereof is not payable to the claimants/co-salvors ... whilst the benefit of such waiver is for the salved property and not for the co-salvors." [383] As under the general maritime law, PHI argues that under Greek law, the benefit of the waiver of claims is enjoyed by the party whose property is subject to the salvage claim.[384] PHI

373. *Compare* Vgenopoulos & Partners Law Firm's Legal Opinion on Law Greek, Rec. Doc. 64–1 at 2 (Plaintiff's opinion) *with* Ince & Co.'s Legal Opinion, Rec. Doc. 65–1 at 3 (PHI's opinion).

374. Vgenopoulos & Partners Law Firm's Legal Opinion on Law Greek, Rec. Doc. 64–1 at 2. The code, as translated by PHI, does not differ in any significant manner.

375. Rec. Doc. 64 at 2.

376. *Id.*

377. *Id.*

378. Rec. Doc. 64–1 at 1.

379. Rec. Doc. 64 at 3.

380. *Id.*

381. *Id.*

382. Rec. Doc. 65 at 4.

383. *Id.* (quoting Vgenopoulos & Partners Law Firm's Legal Opinion on Law Greek, Rec. Doc. 64–1 at 2.)

384. *Id.* at 5.

contends that although Plaintiffs have urged the Court to ignore the Piraeus court's decision because Greece is governed by civil law, PHI's Greek counsel has noted that "in the vast majority of cases judges have the tendency to follow the findings of previous Court decisions, especially if it comes to decisions of the Court of Appeal." [385]

Furthermore, PHI argues, although Plaintiffs contend that they were "assigned" the master and crew's share of the salvage award, Articles 460 of the Greek Civil Code states that "[a]n assignee shall not acquire any right in regard to the debtor and third parties before the assignee or the assignor have notified the assignment to the debtor." [386] PHI alleges that although an action against the debtor may be used to place the debtor on notice of the assignment, "in order for the Court to be able to assess if the claimant's right is actually based on the assignment of the claim by the assignor, it has to be provided with evidence to that effect, i.e. it must be in a position to draw the conclusion, on the basis of the contents of the action, that an assignment has actually taken place and, also, the amount that was assigned." [387] Here, PHI contends, the original complaint contains no indication that the rights of the master and crew were assigned to Plaintiffs, and the record in this matter is silent as to the existence of an assignment. [388] According to PHI, the only evidence on the subject was Phaidon Moustakas' testimony that the crew was not asked to join in this litigation by the Vessel owners. [389]

■ Although Plaintiffs urge the Court to ignore the Piraeus Court of Appeal's decision in No. 455/2008 because Greece is a civil code country where case law is non-binding, this Court—which sits in Louisiana and therefore is especially familiar with the application and consideration of persuasive authority in a civil code jurisdiction—nevertheless finds helpful the persuasive authority of a Greek appellate court applying Greek law. As both Plaintiffs and PHI agree that decision No. 455/2008 would bar Plaintiffs from recovering the portion allotted to the master or crew unless they received a valid assignment of such claims, the Court concludes that, unless Plaintiffs have met their burden of proving that an assignment took place, Plaintiffs are barred from recovering more than 50% of any salvage award in this matter. Moreover, this conclusion is consistent with the American general maritime law, to the extent that it also prohibits Plaintiffs from recovering the portion of any salvage award that could have been claimed by other salvors who did not bring suit.

The Court therefore considers whether Plaintiffs have shown that an assignment of claims occurred in this matter. Although Plaintiffs allege that the Court can infer an assignment because the conduct of the master and crew evidences an intent not to pursue a claim and to instead allow Plaintiffs to pursue a full recovery, [390] as PHI has pointed out, Plaintiffs did not present evidence at trial or in their post-trial briefing that PHI had been affirmatively notified of the assignment. The Court credits Ince & Co.'s analysis that, under Greek law, although serving an action on a debtor can serve to notify that debtor of an assignment of a claim, a court must be pro-

385. *Id.*

386. *Id.*

387. Rec. Doc. 65–1 at 6.

388. *Id.*

389. *Id.* (citing Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 116:3–7).

390. Rec. Doc. 64 at 2.

vided with evidence from which it can conclude that an assignment actually took place and how much was assigned.[391] The Court infers from the fact that the Piraeus Court in decision No. 455/2008 made a distinction between salvors who join in a suit and those who do not, that the filing of a complaint alone by only one potential salvor when others could have joined the suit is not enough to either notify PHI that an assignment took place, nor prove to the Court the nature of the assignment.

Plaintiffs' complaint does not cite any assignment of claims,[392] and the Vessel's master, Phaidon Moustakas, testified that no one had asked, or at least he could not recall whether anyone had asked, the crew to join in the instant suit.[393] Although Moustakas clearly aided Plaintiffs in their recovery in this suit by testifying in this matter despite not bringing a claim of his own, he did not state anywhere in his deposition that he had assigned his interest, either in part or in full, to Plaintiffs. Accordingly, the Plaintiffs have not pointed to any evidence in the record that they put PHI on notice at any time prior to post-trial briefing that they had been assigned either the master's or crew's portion of any salvage award in this case, nor have Plaintiffs presented to the Court evidence that an assignment took place, particularly in light of the fact that the crew does not even appear to have been asked to join in the instant suit. Instead, Plaintiffs have maintained throughout this litigation—in contrast to both American and Greek authority—that "the decision of one or more salvors not to participate in a

claim should [not] detract from the award issued to those salvors who do assert a claim." [394] Without evidence that "the debtor"—meaning PHI—was notified of an assignment, or that such an assignment took place, the Court concludes that Plaintiffs are limited to recover only 50% of the salvage award.

### 2. Apportionment Between the Owners and Charterer

In addition to the arguments regarding apportionment between the owners, the master, and the crew, PHI argues that any salvage award in this matter should be further divided because Aquavita, the Charterer, elected not to participate in this suit.[395] According to PHI, the Time Charter in this case includes a salvage clause, which provides that "all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion." [396] Such a salvage clause, PHI argues, makes the charterer "a joint adventurer in any salvage service." [397] According to PHI, as in cases involving the apportionment between the owner, the master, and the crew, in the presence of such a clause, under the general maritime law, the refusal of the charterer to join in a salvage claim inures to the benefit of the owner of the salved property.[398] Furthermore, PHI argues that the result would be the same under Greek law, as a "Greek Court would give effect to the said provision." [399] PHI acknowledges that the Time Charter includes a choice-of-law provision

---

391. *See* Rec. Doc. 65–1 at 6.

392. *See* Rec. Doc. 1.

393. *See* Dep. Test. of Phaidon Moustakas, Trial Tr., Mar. 17, 2016, at 116:3–7.

394. Rec. Doc. 56 at 18.

395. Rec. Doc. 50 at 11.

396. *Id.* (citing Def.'s Ex. 20, at cl. 19).

397. *Id.* (quoting 1 Norris, *The Law of Seamen* § 9:15 (5th ed.)).

398. *Id.* (citing *Castner, Curran & Bullitt v. United States*, 5 F.2d 214, 217 (2d Cir. 1925)).

399. Rec. Doc. 65–1 at 8.

stating that "disputes" under the Time Charter are to be decided under English law, but argues that American courts have held that such choice-of-law provisions do not govern "collateral" claims.[400] Plaintiffs do not rebut PHI's argument with citations to contrary authority, but assert that PHI's argument regarding Aquavita in its post-trial briefing went outside the scope of the Court's requested briefing, and moreover, is improper and irrelevant because it attempts to address how the Time Charter—a contract governed by English law—would be interpreted and applied under Greek law.[401]

The Court has already held that Greek law, rather than the general maritime law, applies to questions regarding the apportionment of a salvage award in this matter. Nevertheless, for the sake of completeness, the Court considers PHI's arguments regarding the general maritime law herein. In The Kanawha, a 1918 Second Circuit case involving a salvage clause essentially identical to the one in the instant Time Charter, the Second Circuit held that such a clause gave the charterer the right to intervene in a salvage claim in order to recover its share of a salvage award.[402] However, the court was not faced with the question of whether the charterer's *failure* to join the suit would inure to the benefit of the defendant. PHI cites only one case—*The Johnson Lighterage Co. No. 24*[403]—in which it alleges that a court held that the lack of a charterer's participation in the suit should inure not to the benefit of the owner of the vessel, but

to the owner of the salvaged property.[404] However, *The Johnson Lighterage* likewise involved a case in which both the owner and the charterer joined suit, and the court was tasked only with the question of how to apportion the compensation between them.[405] The only case cited by PHI concluding that a provision like the salvage clause in the Time Charter would result in the Court denying to the owners of a vessel any portion of an award that would otherwise go to a charterer pursuant to a contractual agreement between the parties is *Castner, Curran & Bullitt v. United States*.[406] There, the Second Circuit stated that "if any of these parties in interest had refused to proceed, it is true that such refusal would have inured to the benefit of the owners of the salved property."[407] Although *Castner, Curran & Bullitt* involved a salvage clause provision between the salving vessel's owner and charterer similar to the clause in the instant Time Charter, the Second Circuit's statement was merely dictum, because in the case before it, "there [was] no such refusal," as the contract between the owner and the charterer empowered, and perhaps even required, the owner to pursue the salvage claim on behalf of the charterer.[408] As such, the case law provided by PHI does not definitively suggest that even under the general maritime law, which does not apply here, the salvage clause in the Time Charter would require this Court to award Plaintiffs only 50% of the award to

400. *Id.* at 7 (citing *Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 496 (2d Cir. 2013); *Budisukma Permai SDN BHD v. N.M.K. Prods. & Agencies Lanka (Private) Ltd.*, 606 F.Supp.2d 391 (S.D.N.Y. 2009)).

401. Rec. Doc. 68 at 2.

402. 254 F. 762, 764 (2d Cir. 1918).

403. 248 F. 74, 80 (3d Cir. 1918).

404. Rec. Doc. 65 at 7.

405. *See The Johnson Lighterage Co. No. 24*, 248 F. at 82.

406. 5 F.2d 214, 217 (2d Cir. 1925).

407. *Id.*

408. *Id.* at 18.

which the Vessel owners would otherwise be entitled.

Likewise, setting aside the question of whether the Time Charter's salvage clause should be interpreted according to English rather than Greek law, the Court is similarly left unpersuaded by PHI's assertion that Greek law would require this Court to withhold Aquavita's allegedly unclaimed portion of the owners' award. To the extent that Greek counsel hired by PHI opined on the issue, they stated only that "a Greek Court would give effect" to "the provision of the charterparty [sic] in respect of equal splitting of the salvage award between owners and charterers."[409] The Court does not interpret this statement—which is merely a suggestion of what a Greek court would do, unsupported by any authority—to mean that, as in the Piraeus Court of Appeal's decision in No. 455/2008, the Court would prohibit Plaintiffs from recovering for an allegedly unclaimed portion of the salvage award. To state that a Greek court would "give effect to" the salvage clause of the Time Charter could mean, for example, that as in *The Kanawha*, a Greek court would allow Aquavita to intervene in a salvage claim in order to assert its right to its portion of any salvage award earned by Plaintiffs. Moreover, both parties agree that Article 251 of the CPML states that "half of the award belongs to the owner of the vessel, one quarter thereof to the master thereof and the other quarter to the crew thereof, whilst any agreement providing otherwise is void." Article 251 makes no mention of charterers, and the Court is not inclined to further split the owners' half of the award without clear Greek authority authorizing such a division.

Therefore, while the Court agrees that the Time Charter's salvage clause confers a contractual right to Aquavita to claim its half of any salvage award granted to Plaintiffs, the Court has not been presented with binding authority under the general maritime law, Greek law, English law, or otherwise suggesting that this Court must give effect to the provision of the Time Charter by denying to Plaintiffs their right to recover the full amount of the Vessel owner's share of any salvage award. Therefore, the Court declines to further split by 50% Plaintiffs' salvage award in this matter.

### E. Prejudgment Interest

Finally, Plaintiffs request that any award granted by the Court include prejudgment interest at a rate of 9%.[410] Plaintiffs argue that courts often award prejudgment interest in maritime cases at the rate of 5.5%,[411] but that a higher rate of interest has been affirmed in cases involving awards for marine salvage.[412] Here, Plaintiffs argue, the Court should award at least the 5.5% rate that is common within this District, and should increase the rate in light of the fact that "Plaintiff's efforts saved property valued in excess of $2 Million" and that PHI admitted throughout this litigation that Plaintiffs were entitled to at least reimbursement for their actual out of pocket expenses, but has failed to pay even the admitted portion of Plaintiffs' damages.[413]

409. Rec. Doc. 65–1 at 8.

410. Rec. Doc. 64 at 5.

411. *Id.* (citing *Everett v. Atl. Sounding Co.*, 2009 WL 1668507, at *13, 2009 U.S. Dist. LEXIS 50168, at *36 (E.D. La. June 12, 2009); *Cashman Scrap & Salvage, L.L.C. v. Bois d'Arc Energy, Inc.*, No. 07-7068, 2009 WL 3150234, at *6 (E.D. La. Sept. 28, 2009), *aff'd sub nom. Cashman Scrap & Salvage LLC v. Bois d'Arc Energy, Inc.*, 413 Fed.Appx. 758 (5th Cir. 2011)).

412. *Id.* (citing *Platoro, Ltd. v. Unidentified Remains of Vessel*, 695 F.2d 893 (5th Cir. 1983)).

413. *Id.* at 6.

In response, PHI argues that although prejudgment interest is available as a general rule in admiralty cases, the Court may deny prejudgment interest where the circumstances make such an award inequitable.[414] Here, PHI contends, no prejudgment interest should be awarded because both parties have made claims in good faith, and the damages awarded are likely to be substantially less than the amount claimed by Plaintiffs.[415] According to PHI, the salvage claim before the Court is an issue of first impression, and PHI had a good faith basis to argue that such a claim was not viable under existing law.[416] In addition, PHI argues, Plaintiffs waited two years after the date of the actual incident to file their complaint, at the very end of the statute of limitations, and should not be awarded with a windfall for their dilatory behavior.[417]

In the alternative, PHI contends, if the Court does grant prejudgment interest, it should consider the actual loss incurred, if any, to the Plaintiffs in being temporarily deprived of the funds awarded, and it may look to the judgment creditor's actual cost of borrowing money or to other reasonable guideposts indicating a fair level of compensation.[418] According to PHI, "[w]here

plaintiffs have failed to provide evidence that they had actually borrowed money and incurred higher interest costs, [the Fifth Circuit] has generally rejected plaintiffs' arguments that they should have been awarded prejudgment interest at a higher rate." [419] Here, PHI avers, there is no evidence that Plaintiffs incurred any "borrowing expenses," and in such cases, an award of interest at the federal rate is appropriate.[420]

 Pursuant to the Salvage Convention, "[t]he right of the salvor to interest on any payment due under this Convention shall be determined according to the law of the [country] in which the tribunal seized of the case is situated." [421] In the United States, it is generally accepted that "under the maritime law, the award of prejudgment interest is 'well-nigh automatic.' " [422] Furthermore, admiralty courts have discretion in setting the rate of prejudgment interest.[423] In certain peculiar circumstances, however, the Court may deny prejudgment interest altogether, such as in cases "where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against

---

**414.** Rec. Doc. 65 at 9.

**415.** *Id.* (citing *Thuan Vo Tran v. Abdon Callais Offshore, LLC*, 120 F.Supp.3d 554, 571 (E.D. La. 2015); *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 580 (5th Cir. 2015); *Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209, 1217 (5th Cir. 1980)).

**416.** *Id.* at 10.

**417.** *Id.*

**418.** *Id.* (citing *Comar Marine*, 792 F.3d at 580).

**419.** *Id.* (quoting *Comar Marine*, 792 F.3d at 580–81).

**420.** *Id.* at 10–11 (citing *Baltic Captain Shipping Co. v. Blessey Enters., Inc.*, No.06–2499,

2008 WL 4018550, at *9 (S.D. Tex. Aug. 29, 2008); *Osprey Ship Mgmt., Inc. v. Foster*, No. 05-390, 2008 WL 4371376, at *30 (S.D. Miss. Sept. 18, 2008), *aff'd*, 387 Fed.Appx. 425 (5th Cir. 2010); *In re M/V Nicole Trahan*, 10 F.3d 1190, 1197 (5th Cir. 1994); *J. Gerber & Co. v. M/V GALIANI*, No. 90-4913, 1993 WL 185622, at *17 (E.D. La. May 25, 1993)).

**421.** Salvage Convention, art. 24.

**422.** *Jauch v. Nautical Servs.*, 470 F.3d 207, 214–15 (5th Cir. 2006).

**423.** *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, & Furniture, in a Cause of Salvage, Civil & Mar.*, 695 F.2d 893, 907 (5th Cir. 1983).

the award, or where the damages award was substantially less than the amount claimed by plaintiff." [424]

■ Here, once again, both Plaintiffs and Defendant take extreme and opposing positions, with one side advocating for an unusually high interest rate of 9%, and the other arguing that no pre-judgment interest should be awarded at all.[425] Although Plaintiffs request a high prejudgment interest rate, they present no evidence that they have been substantially prejudiced by any delay in receiving funds, nor have they presented evidence of the actual costs they incurred in borrowing money. Furthermore, the factors that often lead courts to deny or reduce an award of prejudgment interest weigh in opposite directions in this case. For example, although Plaintiffs waited until the end of the statute of limitations period to file their complaint, there is no allegation that they otherwise engaged in dilatory tactics in this litigation, and indeed the case went to trial less than one year after the complaint was filed.[426] Furthermore, the damages ultimately awarded are substantially less than those claimed by Plaintiffs,[427] which weighs against an award of prejudgment interest,

but this was not a case of two parties with "good faith claims [who] both have been found to be at fault," which therefore weighs in favor of allowing prejudgment interest.[428]

Accordingly, weighing the facts and circumstances of this case, and considering the lack of evidence by Plaintiffs that they were forced to borrow at a higher interest rate than usual, the Court finds an award of prejudgment interest from the date of judicial demand is appropriate in this case for past damages as described above, at the 4% rate of interest set by Louisiana law for prejudgment interest.[429]

## IV. CONCLUSION

For the reasons above, the Court finds that Plaintiffs have prevailed on their cause of action for a claim of salvage pursuant to the 1989 Salvage Convention and/or general maritime law, and are entitled to a $50,000 salvage award, in addition to the $15,649.12 in actual costs incurred. However, pursuant to the Salvage Convention, which compels the Court to apply Greek law in determining the apportionment of any salvage award between the "owner, master and other persons in the

**424.** *Reeled Tubing, Inc. v. M/V Chad G.*, 794 F.2d 1026, 1028 (5th Cir. 1986).

**425.** Moreover, neither party even briefed the issue until the Court prompted them to do so post-trial. *See* Rec. Doc. 63.

**426.** *Cf. Thuan Vo Tran v. Abdon Callais Offshore, LLC*, 120 F.Supp.3d 554, 571 (E.D. La. 2015) (Zainey, J.) (declining to award prejudgment interest in a case that had two trial dates set shortly after the incident, both of which were continued on motion by the plaintiffs over the objections of the defendants).

**427.** *See Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 580 (5th Cir. 2015) (affirming a denial of prejudgment interest where the awarded damages were substantially less than originally claimed).

**428.** *Cf. St. James Stevedoring Partners, LLC v. Motion Navigation Ltd.*, No. 13-541, 2014 WL 3892178, at *19 (E.D. La. Aug. 6, 2014) (Lemmon, J.) (declining to award prejudgment interest to either party where there was a genuine dispute over a good faith claim and mutual fault). PHI argues that a "good faith dispute" is sufficient to deny an award of prejudgment interest, but in fact, the Supreme Court has explicitly rejected such a broad basis for denial of prejudgment interest. *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 198, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995) ("In sum, the existence of a legitimate difference of opinion on the issue of liability is merely a characteristic of most ordinary lawsuits. It is not an extraordinary circumstance that can justify denying prejudgment interest.").

**429.** La. R.S. 13:4202(B)(1).

service of each salving vessel," Plaintiffs are entitled to only 50% of any salvage award rendered by this Court. Therefore, Plaintiffs may recover $15,649.12 in actual costs, as well as $25,000 (50% of $50,000) as a salvage award, for a total of $40,649.12, plus prejudgment interest in the amount of 4%.

Accordingly,

**IT IS HEREBY ORDERED** that there be judgment in favor of Plaintiffs Sunglory and Aeolian Investments and against Defendant PHI on Plaintiffs' claim for a salvage award in the amount of $40,649.12.

**IT IS FURTHER ORDERED** that Plaintiffs are entitled to prejudgment interest on their award in the amount of 4%.